UNITED STATES of America

v.

Charles MATTHEWS, Appellant.

No. 22310.

United States Court of Appeals
District of Columbia Circuit.

Argued April 7, 1969.

Decided Nov. 10, 1969.

J. Skelly Wright, Circuit Judge, dissented.

Mr. John A. McGuinn, Washington, D. C. (appointed by this court), for appellant.

Mr. Robert S. Bennett, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., at the time the brief was filed, Frank Q. Nebeker, Asst. U. S. Atty., at the time the brief was filed, and Carl S. Rauh, Asst. U. S. Atty., were on the brief, for appellee.

Mr. Thomas A. Flannery, U. S. Atty., also entered an appearance for appellee.

Before WRIGHT, McGOWAN and TAMM, Circuit Judges.

McGOWAN, Circuit Judge:

Indicted for burglary in the second degree, petit larceny, and engaging in a riot (22 D.C.Code §§ 1801(b), 2202, and 1122(b) (1967)), appellant was acquitted by a jury in the District Court of the first such offense, but found guilty of the other two. Given consecutive sentences of three and six months, respectively, for petit larceny and riot, appellant challenges in this court only the conviction for riot.[1] We affirm.

## I

The witnesses for the Government were five police officers who, at about eight o'clock on the evening of April 5, 1968, were on duty near Eddie's Liquor Store at 8th and I Streets in the southeast section of Washington.[2] Officer Harrison testified that that store had been broken into, its windows smashed, and several people could be seen inside gathering up merchandise. Appellant, so said the officer, was one of them; and the officer arrested him as he was coming out of the store carrying a large brown paper bag full of bottles of liquor.

Harrison, and the other four officers, testified at length about the setting in which this incident occurred. Many people were assembled in the streets and on the sidewalks, out of control and creating conditions of chaos. There was looting going on on all sides, incident to the burning and smashing of business establishments. The police were the objects of verbal abuse and physical attack in the form of thrown bottles. The situation was, in short, that which widely prevailed in the District of Columbia on the night following the assassination of Dr. Martin Luther King, Jr., and which eventually resulted in the summoning to the aid of the police of nearly 14,000 military personnel.

Appellant was the sole witness for the defense. He did not dispute the description given by the policemen of the tumult and disorder. He admitted he was in the vicinity of Eddie's Liquor Store at the time, but denied that he was inside the store itself. He said that he was in the area looking for his wife, and that he came upon the liquor in a bag resting among a lot of other bottles in a

1. After sentence was pronounced, the District Court released appellant upon personal recognizance pending appeal, and also informed appellant that, if his conviction was sustained upon appeal, the court would, given a satisfactory performance by appellant in the interim, reexamine the sentence with a view to seeing whether its purposes could be served without a requirement of actual incarceration.

2. The Government's proof also included stipulations that (1) at 5:30 P.M. on April 5, 1968, Mayor Washington had declared a curfew to be effective from that hour until 6:30 A.M., and (2) the proprietors of the store would, if called by the Government, testify that they had closed the store at 3:00 P.M. on April 5, 1968, and had authorized no one to be in it at 8:00 P.M. that evening.

yard adjoining the store. His version of what then happened is:

"I picked the bag up. All the looting was happening around. I just picked the bag up and kept walking. I didn't want to be caught in the store."

He said that he was arrested a few minutes later as he was walking up the street towards the house of a friend.

At the close of the Government's case, appellant moved for a directed verdict of acquittal on the ground that the identification evidence against him was too weak. This motion was denied, and the issue is not pressed here. At the close of the entire case, there was a colloquy between court and counsel about the instructions to be given. The court indicated his purpose to use, in connection with the riot charge, a form of charge which had been devised specially in the District Court to be used in the riot cases. Defense counsel had been furnished with the text of this charge, and when asked whether he had any objection to it, he raised a question as to whether there was any evidence showing that appellant was "encouraging the riot or in any way furthering it." The court responded to the effect that there was evidence that appellant had "entered [the store] and participated in that looting"; and that the court regarded this as evidence of encouraging the riot.

This prompted defense counsel to ask the court how it would view the matter if the jury found the fact to be that appellant picked up the liquor outside the store, as he testified he had. The court replied that it "would be willing to instruct [the jury] * * * that if they find that [appellant] did not engage in the looting of the store but merely picked up an indiscriminate package that was in the yard and walked on, that they cannot find him guilty of rioting." The prosecutor, upon inquiry from the court, said that he would have no objection to such an instruction. At that point the court recessed until the following morning.

Upon the reconvening of court the next day, the trial judge, prior to charging the jury, informed counsel that he had been reflecting on his comments of the previous afternoon, and had concluded that they were wrong. The judge remarked that appellant's own testimony would bear the construction that he knew the liquor he seized was a product of the looting which was a central feature of the general disorders, and that "if the jury were to determine that [appellant] knew this was looted goods, his picking it up and carrying it appears to the Court to be sufficient to hold him as having taken an affirmative act in furtherance of the acts of an assemblage engaged in tumultuous and violent conduct." The court went on to say that it proposed to stand on the charge as theretofore formulated, leaving it to the jury to decide whether appellant's conduct came within the reach of the statute as so construed.[3] Defense counsel thereupon entered an objection to the failure to charge that, if the jury believed appellant not to have been within the store,

3. THE COURT: I am going to charge them that it is sufficient to establish wilfulness on the part of the Defendant if you find from all the evidence that by acts, gestures or words he knowingly and intentionally aided or encouraged the tumultuous or violent conduct involving grave danger to property or persons. And I think the question for the jury is whether or not someone who comes into a looting situation and it can be argued picks up goods that he knows is looted goods, and proceeds down the street with it, in the general atmos-

phere of the moment, cannot be found to have aided or encouraged the condition that the statute condemns.

This is not a case where someone came along the next day and picked up the looted goods, or even later that night after things had quieted down. But he picked it up and he picked up goods that he couldn't put in his pocket. His mere carrying would add, it seems to the Court— at least it could be argued—would add to the tumultuous and violent conduct.

it must acquit him of riot. After the instructions were given, he professed satisfaction with them except in this one respect.[4]

When appellant came before the court for sentencing, his counsel moved to dismiss the riot count of the indictment on the ground of the invalidity of the statute for vagueness within the ban of the Due Process Clause. This argument was essentially the same as that made to the District Judge in another pending case, United States v. Jeffries, 45 F.R.D. 110, 114 (D.D.C.1968); and the court indicated that its ruling in that case would be determinative. Not long thereafter the court entered an order of denial, accompanied by the memorandum opinion it had issued in the interim in *Jeffries*.

## II

We deal first with the broad constitutional challenge to the statute which is mounted on this appeal. Appellant's formulation of that attack does not assert an inherent lack of power in the Congress to address itself in criminal terms to the phenomenon of riotous conduct.[5] It insists, rather, that Congress has gone about its business in this instance in so imprecise and clumsy a manner as to collide with the due process concept of undue vagueness.

The elements of that concept are differentiable. One is that the legislative proscription may, as a matter of rhetoric, be so fuzzy or opaque as unfairly (a) to provide the accused with inadequate advance notice of what conduct on his part will expose him to crim-

inal sanctions, or (b) to enable the jury to convict him without itself having a very clear idea of just what he was supposed not to do. The other central aspect of the vagueness doctrine is the concern that the legislature, in seeking to make some acts illegal, will sweep too broadly in its definitional efforts and thereby bring within its net constitutionally protected activity which, although legally immune in theory, will in fact be deterred by the prospect of criminal prosecution.[6]

Appellant relies upon both. He argues that the Congressional employment of words like "public disturbance," "tumultuous and violent conduct," "grave danger of damage or injury," and "engages in," only serve to obscure, rather than to illuminate, Congressional purposes. These words do not, so it is said, provide anything like a reasonably clear signal of the shoal waters of criminality, and that trying to steer by beacons as dim as these is hazardous in the extreme. The individual who is made to do so is thus at a loss to know by what standard he should measure his own acts, or whether the same standard will be brought to bear upon those acts by judge and jury. The consequence too often may be that he will decide it is safer not to act at all and thereby forego the exercise of rights and privileges guaranteed him by the Constitution, particularly the First Amendment with its political freedoms of speech, assembly, and petition.

Appellant here relies heavily on a group of state cases, *see, e. g.,* Giaccio v. Pennsylvania, 382 U.S. 399, 86 S.Ct. 518,

---

4. The charge in its entirety as to the crime of engaging in a riot is set forth an an appendix to this opinion.

5. *Indeed, it would be difficult for appel-lant to press such a point seriously in light of the long history of common law and statutory proscription of riots in the states. For a collection of the state laws on riot, see Hearing Before Subcommittee No. 4 of the Committee on the District of Columbia, on H.R. 12328, H.R. 12605, H.R. 12721, and H.R. 12557, Oct. 4, 1967, Appendix 35–64. Nor does*

appellant express opposition to the fact that in this statute, unlike the requirements of common law and in the early state statutes, there is no necessity for a conspiracy or purposeful joining together to be proved in order to have a riot occur. This recognition of the spontaneity of many recent riots is crucial in making punishable the acts which Congress intended to prohibit.

6. *See generally* Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L.Rev. 67 (1960).

15 L.Ed.2d 447 (1966); Baggett v. Bullitt, 377 U.S. 360, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964); Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); and Cox v. Louisiana, 379 U.S. 536, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965), in arguing that the D.C. anti-riot statute fails to pass muster under either of the twin aspects of the vagueness criterion.[7] The Government has cited a number of cases, of which United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963), is perhaps the most significant, which suggest that this statute is neither unintelligible nor overly expansive.

■ Neither of appellant's expressed concerns raises, in our view, a threat of constitutional deprivation sufficient to warrant this court's setting the work of Congress wholly at naught. As with any new statute which has not had the benefit of construction by the courts, there may be problems of interpretation. At least two considerations, however, make the potentially grey areas of this statute acceptably narrow. First, the language of the statute contains several specific strictures, each of which a person must disobey in order to be subject to its penalties. A person must not only *willfully* associate himself with an assemblage involving at least five people, but that group must be causing or threatening tumult and violence in such fashion as to create "grave danger of damage or injury to property or persons." The legislative history of this provision expresses clearly the Congressional purpose which underlay it, namely, that a statute be passed to enable the law enforcement authorities to handle future riotous situations in the District of Columbia similar to those which had afflicted cities such as Newark and Detroit the summer before.[8] There is scant room, therefore, for mistaking the conduct contemplated by the statute when the words in question are read in that context.

We think that the operative words of this statute carry no greater burden of ambiguity than is the lot of language generally. The combination in which they occur, and the context in which they came into being, are powerfully suggestive, even to the least sophisticated, of an aura of reprehensibility. It requires no uniquely sharpened social perceptions to know what one should—and what one should not—do when confronted with the incendiary conditions in the streets which were the patent concern of Congress.

In this respect, United States v. National Dairy Products Corp., 372 U.S. 29, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963), is especially instructive. In *National Dairy* the Supreme Court held that Section 3 of the Robinson-Patman Act, prohibiting, upon pain of criminal punishment, the setting of "unreasonably low prices for the purpose of destroying competition or eliminating a competitor," was not unconstitutional as applied to "below cost" sales without a legitimate commercial objective and with a specific intent to destroy competition. This was so, said the Court, because, despite the generality of the terms used no businessman tempted by a prospect of predatory price-cutting could fail to know in his bones what Congress was getting at, and "could * * * reasonably under-

---

7. Appellant also relies on one federal case where a state anti-riot statute was declared unconstitutional. *See* International Longshoremen's & Warehousemen's Union v. Ackerman, 82 F.Supp. 65 (D. Hawaii 1948), rev'd, 187 F.2d 860 (9th Cir. 1951). *But see* Heard v. Rizzo, 281 F.Supp. 720 (E.D.Pa.), aff'd per curiam, 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968); Landry v. Daley, 280 F.Supp. 938. (N.D.Ill.1967), appeal dismissed *sub nom.*, Landry v. Boyle, 393 U.S. 220, 89 S.Ct. 455, 21 L.Ed.2d 392 (1968).

8. *See* S.Rep. No. 912, 90th Cong., 1st Sess. 25–26 (1967); *see also* Hearing Before Subcommittee No. 4 of the Committee on the District of Columbia, on H.R. 12328, H.R. 12605, H.R. 12721, H.R. 12557, Oct. 4, 1967.

stand that his contemplated conduct is proscribed."

Although the statute here was of necessity aimed at a less sophisticated audience than those who ponder the antitrust laws, the subject matter of the statute is also less complex or unfamiliar. There are few citizens indeed who do not know a public riot when they see one, or who would not understand at least the general objective of the restraints upon personal conduct Congress prescribed to be observed upon such a confrontation. The Congressional focus was, it is clear from the legislative history, upon mindless, insensate violence and destruction unredeemed by any social value and serving no legitimate need for political expression.[9] We do not see, any more than did the District Court, any necessity for striking this statute down on its face, either because this legislative concern—and the restraints it entailed—could not conceivably have been adequately visible, or because the purposes of the statute might hypothetically be sought to be twisted to encompass another case than the one before us.

### III

The other ground of reversal urged upon us by appellant is couched in terms of a claim that the District Court erroneously failed to direct a verdict of acquittal. The argument in support of this point follows a course of asserting first that the jury's acquittal of appellant on the burglary charge establishes that the jury accepted appellant's version of the facts rather than Officer Harrison's, and that it was, on this premise,

error for the court to interpret the statute as permitting the jury to bring in a verdict of guilt.

 We note preliminarily that appellant did not ask the trial court to keep the case from the jury and to direct a verdict. He sought, rather, an admonition of the jury to the effect that, if it did take appellant's testimony to be true, it should acquit him of the riot count. But, absent an instruction of that kind, it is ordinarily impossible to make any assumptions as to precisely how the jury viewed the facts. What lies behind a jury's general verdict of guilty or not guilty is something not given to ordinary mortals to know; and, as the Government argues with some force, the first leg of appellant's argument on this score is unavailing.

This still leaves, however, the question of whether the trial court should have given the requested instruction; and that question, as the trial court itself observed in noting appellant's objection, "is a close one." It turns upon the propriety of a construction of the statute which finds in it a Congressional purpose to regard one as willfully engaging in a riot who openly seizes and endeavors to carry away property which he knows to be accessible to him only by reason of the current destruction and looting. Appellant suggests to us that such conduct is, at most, amenable to paragraph (c) of Section 1122 ("Whoever willfully incites or urges other persons to engage in a riot * * *"), and reminds us that appellant was not charged under that paragraph. He further argues that, with paragraph (c) so unavailable, riot

---

9. Appellant would have us believe that the Congressional intent was not so clear, and that not only riots of the Newark and Detroit type, but also demonstrations such as the October 21, 1967, anti-Viet Nam War march, were also a prime object of the legislative interest. But the isolated remark of one Congressman does not constitute any authority for the proposition that Congress as a whole intended to jeopardize the validity of the statute by making it trespass on protected First Amendment rights. *See*

Statement of Hon. William L. Scott, a Representative in Congress from the State of Virginia, Hearing Before Subcommittee No. 4 of the Committee on the District of Columbia, on H.R. 12328, H.R. 12605, H.R. 12721, and H.R. 12557, Oct. 4, 1967, at p. 6. Rather, one need only examine the great weight of the testimony before the Congress to see that the statute was conceived of as directed to disorders unrelated to political demonstrations.

as defined in paragraph (a) cannot possibly justify an equation of appellant's assumed behavior with the "tumultuous and violent conduct" creating "grave danger of damage or injury to property or persons" comprising that definition.

The District Court in its charge to the jury defined "damage or injury to property" as including "either actual physical damage to property or the taking of another's property without the consent of the owner"; and we do not understand appellant to question this proposition. Appellant, by his own admission, must therefore be taken to have engaged in conduct involving damage or injury to property. But this, says appellant, is the larcenous conduct for which he is to be punished as provided in the larceny statute; it is *not* the "violent and tumultuous" conduct identified in Section 1122 (a) as an essential element of riot.

The theory of the District Court was that one may "engage in" violent or tumultuous conduct by knowingly and intentionally aiding or encouraging it "by acts, gestures or words"; and that the jury could find such willful engagement here from the tendency of appellant's conduct to enlarge, and to perpetuate, the atmosphere of violence and tumult all about him. The court came eventually to embrace a concept of a larcenous act which, because of the peculiar dangers it creates by reason of the special circumstances under which it is done, results in an extra dimension of criminality which Congress may be thought to have marked out for punishment over and above that provided by larceny alone.[10]

■ We cannot say that this is an untenable divination of the Congressional purpose *vis-a-vis* one situated as was appellant by reference to his own testimony, or that the Congressional purpose as so applied transcends constitutional limits. If Congress had said in so

many words, "Looting, of both a primary and a secondary nature, is an invariable and inevitable aspect of the kind of public disturbances with which we are concerned, and such disturbances are likely to be intensified and prolonged by any act which promotes or encourages such looting. Therefore, any person who, upon encountering a riot, openly seizes goods he knows to have been looted or accessible to him only by virtue of the disturbance, will be deemed to have aided, encouraged and furthered the riot and, by so doing, to have engaged in it," there would be no question of the Congressional power to make that conduct criminal, nor any mistaking of its purpose to do so. We think it not beyond the capacities of ordinary men to understand that Congress, by the statute in question, intended to comprehend this contingency.

Of the scene in the vicinity of Eddie's Liquor Store on the night in question, Officer Connally testified that "Everybody was running up and down the street carrying articles. * * * There was immediate chaos. Everybody was going wild. * * *" This testimony seems to us quite relevant to the issue before us. It eloquently confirms what we must assume Congressmen to know in common with other men, that is to say, a public riot is a phenomenon which feeds on itself and for which the cooling influence is the cessation of all activity which tempts others to swell the throng and to engage in similar acts.

■ There are here, as in other areas of human life, greater and lesser degrees of culpability, in fact if not in law. The rioter who smashes the store windows or breaks in the door is no doubt more blameworthy than the man who moves to get his share of the liberated goods because other people seem to be doing the same thing. But even this move contributes to the tumult and promotes

10. The District Court took note in its memorandum opinion that all indictments returned in the District of Columbia for engaging in a riot had included a count for independently unlawful conduct, and that it was the latter which was uniformly relied upon as proving the willful engagement in the riot itself.

new violence. It attracts people to the scene who have no business there. It harasses the police, and very likely diverts them from more compelling claims upon their efforts. It, inescapably it seems to us, identifies the individual with the climate of violence and turmoil and makes him, in any realistic sense, a part of it. The public disturbance with which this statute deals is undoubtedly compounded of unlawful conduct variously deriving from purposeful destructiveness and foolish greed. That the latter does not offer as ugly a face does not mean that the two do not interact upon each other and make a common, albeit perhaps unequal, contribution to the evil against which the statute is aimed.

Appellant was, by his own testimony, more than a mere bystander. He may, as he contends and as we assume for this purpose, have been less than a smasher of windows and an invader of private premises. But his contribution to the miasma of violence and destruction, which lowered abruptly over the District of Columbia on April 5, 1968, and took several days to lift, is sufficiently substantial to warrant the conclusion that Congress may be taken to have conceived of him as "engaging in" the riot and to have warned him in advance that he would be dealt with as something more than a petty thief.

██ No one can say on this record that the District Court was insensitive to the considerations pointing to a different result. In our judgment, the product of its more mature reflection is an accurate reading of the statute, and the statute as so read is not in conflict with the Constitution. The District Court did not, accordingly, err in refusing the requested instruction.[11]

Affirmed.

## APPENDIX

The essential elements of this offense again must each be proved by the Government beyond a reasonable doubt. They are basically three: That there was a public disturbance within the District of Columbia which by tumultuous and violent conduct or the threat thereof created grave danger of damage or injury to property or persons. That there was an assemblage of five or more persons including the Defendant engaged in the public disturbance. And that the Defendant and at least four other members of the assemblage wilfully engaged in the public disturbance.

Now, first, what is a public disturbance involving tumultuous and violent conduct or the threat thereof which creates grave danger of damage or injury to property or persons? The conduct involved must be something more than mere loud noise-making or minor breaches of the peace. The offense requires a condition that has aroused or is apt to arouse public alarm or public apprehension where it is occurring. It

11. The dissenting opinion hypothesizes a number of cases involving purely passive observers, and appears to believe that, in order to put such non-participants beyond the reach of the statute, appellant must be regarded as one himself. But, by his own testimony, he is not; and what we hold—and all we hold—is that one who knowingly participates in the looting phase of a riot can, without constitutional transgression, be comprehended by Congress within those identified by the statute as engaging in the proscribed "violent and tumultuous conduct." The illegal dispersion and misappropriation of merchandise, which is a central feature of the particular kind of rioting to which Congress expressly addressed itself, does not become looting on one side of the broken door or window, and something else on the other. Appellant's own testimony pretends to no innocence in this respect, but he now seeks to make of this accident of location a basis for saying that his larceny must be viewed as something apart from the riot. The trial court's instructions explicitly admonished the jury that appellant's engagement in the riot must be found to be knowing and intentional. Appellant's own testimony was such as to support such an inference. It is, thus, difficult to see how our opinion can accurately be characterized as excising from the statute the element of willfulness.

involves frightening group behavior. Tumultuous and violent conduct will usually be accompanied by the use of actual force or violence against property or persons. At the very least it must be such conduct as has a clear and apparent tendency to cause force or violence to erupt and thus create a grave danger of damage or injury to property or persons.

By damage or injury to property I include either actual physical damage to property or the taking of another's property without the consent of the owner. The term, "grave danger," means something more than the possibility of danger or a minor difficulty. The danger may be actually present or threatened. It must definitely be clearly serious and if not occurring immediately then it must be very imminent.

Now, what is meant by an assemblage engaged in such a disturbance? This term in the context of a riot connotes an angry or aroused crowd or gathering. The assemblage must number at least five persons including the Defendant. It may, of course, be larger. In determining whether there was an assemblage, you may take into account only what was taking place in the general vicinity where the Defendant is claimed to have engaged in the public disturbance. You may consider only the acts, shouts and noise of individuals engaged in tumultuous and violent conduct within the general awareness of the Defendant, that is, the activities which on the evidence you find he could reasonably have been expected to see or to hear at or about the time he engaged in the public disturbance if, in fact, you determine he did so engage.

It is not necessary for the members of the assemblage to have acted pursuant to an agreement or plan, either made in advance or made at the time, or for the members to concentrate their conduct on a single piece of property or one or more particular persons. The Defendant does not have to personally know or be acquainted with the other members of the assemblage. The other members of the assemblage need not be identified by name or their precise number established by the evidence.

You may consider all the facts and circumstances shown by the evidence and determine from the evidence as a whole whether or not there existed an assemblage of five or more perons engaged in a public disturbance involving tumultuous and violent conduct or the threat thereof which created grave danger of damage or injury to property or persons.

And third, what is meant in law by the requirement that the Defendant and the other members of the assemblage must have engaged in such a disturbance wilfully? This means that the Defendant and at least four members of the assemblage participated in the public disturbance on purpose, that is, that each knowingly and intentionally engaged in tumultuous and violent conduct consciously, voluntarily and not inadvertently or accidentally.

It is sufficient to establish wilfulness on the part of the Defendant or any other member of an assemblage if you find from all the evidence that by acts, gestures or words he knowingly and intentionally aided or encouraged the tumultuous or violent conduct involving grave danger to property or persons. Wilfulness may be inferred. A person is presumed to have knowingly done and intended the natural consequences of his acts. The mere accidental presence of the Defendant among persons engaged in such a public disturbance, however, without more, does not establish wilful conduct or involvement.

The offense of engaging in a riot is a separate and different offense than burglary two or petty larceny. You should, as already indicated, give separate consideration and render separate verdicts with respect to the Defendant's guilt or innocence of each of the offenses charged in each of the three counts. However, in determining whether the Defendant is guilty or not guilty of the offense of engaging in a riot, you may consider all relevant evidence which was introduced during the trial, including evidence, if you find there is any, relat-

ing to the Defendant's participation in the offense of burglary two and/or petty larceny.

**J. SKELLY WRIGHT, Circuit Judge (dissenting):**

Martin Luther King, Jr. was assassinated on April 4, 1968. Following his death, several days of violent disorder swept the Negro areas of many cities, including Washington, D. C. This case arises out of an incident which occurred during Washington's "April Riots."

Testimony by five police officers and the appellant in this case, Charles Matthews, established that at about 8:00 P.M. on April 5, the second night of the disorder, violence had engulfed the vicinity of Eighth and I Streets in the Southeast section of Washington. A fire was apparently burning in the 700 block of Eighth Street, the sirens of fire engines and police cars were blaring, people were milling about, and several establishments along Eighth Street were being looted. One of these was Eddie's Liquor Store at the corner of Eighth and I Streets.

At this point, however, agreement ends, and the testimony conflicts sharply about the circumstances surrounding appellant's arrest. The arresting policeman, Officer Harrison, testified that he saw appellant inside Eddie's Liquor Store and arrested him "at the entrance" of the liquor store (on Eighth Street) "crossing the threshold of the door" with a paper bag containing liquor bottles.[1] Testifying in his own defense, appellant strenuously denied that he had entered Eddie's Liquor Store. He testified that he was in the area looking for his wife. According to his story, he walked up I Street, crossed Eighth Street, and continued up I Street. As he passed Eddie's Liquor Store on I Street, he noticed several bags and bottles of liquor in the yard at the side of the store. Appellant testified that he picked from the yard a bag containing several bottles and then proceeded up I Street where he was arrested several minutes later.

Appellant was subsequently charged with second degree burglary,[2] petit larceny,[3] and engaging in a riot.[4] During the trial, appellant requested the trial judge to instruct the jurors that, if they believed his story, they must find him not guilty of engaging in a riot. Although the trial judge found the question "close," he declined to give such an instruction. Rather, he gave the standard instruction which the District Court has developed [5] for charges under the District of Columbia riot statute. The jury acquitted appellant on the burglary charge, indicating at least the possibility they believed his testimony that he did not enter the liquor store, but found him guilty of petit larceny and engaging in a riot. On this appeal, appellant challenges only his conviction under the D. C. riot statute. He makes a frontal attack on the statute, urging that it violates both the First Amendment and the Due Process Clause of the Fifth Amendment. Alternatively, he argues that, if the statute is narrowly construed to save it from constitutional attack, then it does not reach the conduct described in his version of the events in this case. Under these circumstances, he contends that the trial court's failure to so instruct the jury was reversible error.

The majority disagrees with both of these contentions. It holds the D. C. riot statute to be constitutional, and then interprets it to reach even appellant's own version of his conduct. I find, however, that the D. C. statute as interpreted by the majority goes substantially beyond both the common law crime

---

1. Three other police officers were with Officer Harrison at the time of the arrest; only one confirmed the identification of appellant as a man arrested coming out of Eddie's Liquor Store.

2. 22 D.C.Code § 1801(b) (Supp. II 1969).

3. 22 D.C.Code § 2202 (1967).

4. 22 D.C.Code § 1122(b) (Supp. II 1969) (hereafter referred to as the D.C. riot statute).

5. The full text of the instruction is set out in the Appendix to the majority opinion.

of riot and most state riot laws.[6] The fact that no other court has upheld so broad a statute raises serious doubts about the constitutionality of the majority's expansive interpretation.[7] In my view, the statute's plain language, construed in accordance with well accepted principles of statutory construction, properly leads to a narrower interpretation of the law.[8] Although the question remains a close one, I believe that the D. C. riot statute, so construed, is constitutional.

I agree with appellant, however, that the statute, when properly interpreted, does not reach the conduct which he alleged was the extent of his involvement in the April Riots. The trial court's failure to give the instruction requested by appellant was, therefore, error. I would vacate the conviction and remand the cause for a new trial.

## I

Until 1967, the District of Columbia dealt with riot situations through statutes prohibiting unlawful assembly and disorderly conduct.[9] In addition, the other substantive criminal provisions of the District of Columbia Code left District officials far from defenseless against riotous disorders. Nonetheless, in response to the severe riots which swept the ghetto neighborhoods of many American cities in the summer of 1967, Congress enacted the D. C. riot statute as part of the District of Columbia Crime Act[10] in December 1967. The portion of the statute relevant to this appeal provides:

> "(a) A riot in the District of Columbia is a public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons.

"(b) Whoever willfully engages in a riot in the District of Columbia shall be punished by imprisonment for not more than one year or a fine of not more than $1,000, or both." [11]

There are two broad questions involved in interpreting this statute. First, what constitutes "violent and tumultuous conduct or the threat thereof [which] creates grave danger of damage or injury to property or persons"? Second, to what degree must an individual be involved in such conduct to be convicted under the statute?

I begin by spelling out my understanding of the majority's position on both questions. The majority considers the issue of the violence required to invoke the statute in the light of what it finds to be the congressional purpose to address "riotous situations * * * similar to those which had afflicted cities such as Newark and Detroit * * *." Thus the majority opinion finds that the violent conduct reached by the statute suggests "an aura of reprehensibility," and "incendiary conditions in the streets":

> " * * * The Congressional focus was, it is clear from the legislative history, upon mindless, insensate violence and destruction unredeemed by any social value and serving no legitimate need for political expression."

Majority opinion at 1182.

I take these various characterizations to be an interpretation of the "grave danger of damage or injury" which must be present before this statute can be invoked. The statute is unclear whether "grave" applies merely to the *danger* of damage or whether it also applies to the *amount* of damage which must be caused or threatened. I take the majority's holding to be that there must be a clear and present danger of *severe* damage or injury to bring the D. C. riot statute into play.

---

6. *See* Part I *infra.*

7. *See* Part II *infra.*

8. *See* Part III *infra.*

9. 22 D.C.Code §§ 1107, 1121 (1967).

10. Pub.L. 90–226, 90th Cong., 1st Sess., 81 Stat. 734 (1967).

11. 22 D.C.Code § 1122(a) and (b) (Supp. II 1969).

I can, however, extract no enforceable or meaningful limitations beyond this requirement from the majority's language quoted above. As the majority appreciates, this statute operates in the area of First Amendment freedoms. It would blink reality not to realize that what begins as a political or social demonstration may end violently,[12] and the violence may come from some of the demonstrators, from counter demonstrators, or from officials.[13] Indeed, the demonstrations which followed the death of Dr. King began peacefully. On hearing of his assassination, people simply came out into the streets to grieve together in public, to mourn the loss of their religious, political and social leader, and to condemn his murder.[14] The violence which followed was the work of relatively few of the demonstrators. Yet an expansive reading of the riot statute here would place in jeopardy the liberty of any demonstrator on the street who happened to witness the violence. The chill which such jeopardy would place on the exercise of First Amendment rights is just as obvious as the unconstitutionality of any statute which provides such a deterrent.[15]

Therefore, I find little comfort in the majority's declaration that the statute applies only to mindless, insensate violence unredeemed by social need or legitimate political expression. In my judg-

ment, society has a right to prevent destructive violence regardless of the context in which it occurs. But society has no right to suppress peaceful political protest. Recognizing that the exercise of First Amendment rights, particularly by minorities, often results in violence, the only way to protect legitimate activity is to insure that our laws focus precisely and exclusively on violent conduct and on its perpetrators and not beyond. And it is here that, in my judgment, the majority falters in its interpretation of the D. C. riot statute.

While I find the majority's requirement that the violent and tumultuous conduct must threaten *serious* damage or injury a step in the right direction, its interpretation of the degree to which an individual must be involved in such conduct moves dangerously in the wrong direction. The majority opinion finds that the riot statute may properly apply to a person who has done no violent or tumultuous act himself. Specifically, in appellant's case it holds that one who, though acting independently and nonviolently, picks up apparently abandoned looted goods has "engaged in" a riot because his conduct "aids or encourages" the violence and tumult which the statute expressly punishes. Thus the majority first reads out of the statute any element of concerted action[16] and then reads into its coverage anyone who unintentionally[17] "aids and encourages." Al-

12. For a careful historical and comparative analysis of violence associated with various political and protest movements, *see* the two-volume study prepared for the National Commission on the Causes and Prevention of Violence, H. Graham & T. Gurr (eds.), Violence in America: Historical and Comparative Perspectives (1969). Perceptive commentary on the frequency with which violence has accompanied American protest movements is provided by another task force report to the Commission, J. Skolnick, The Politics of Protest (1969).

13. *See, e. g.,* D. Walker, Rights in Conflict (1968). *Compare* Terminiello v. City of Chicago, 337 U.S. 1, 5, 69 S.Ct. 894, 93 L.Ed. 1131 (1949).

14. *See, e. g.,* B. Gilbert, Ten Blocks from the White House 14–15 (1968); *compare*

Comment, Criminal Justice in Extremis: Administration of Justice During the April 1968 Chicago Disorder, 36 U.Chi.L. Rev. 455, 467 (1969).

15. *See* Keyishian v. Board of Regents, 385 U.S. 589, 601–602, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967); Cox v. Louisiana, 379 U.S. 536, 551–552, 85 S.Ct. 453, 13 L.Ed.2d 471 (1965).

16. *See* majority opinion at 1180 n. 5.

17. The majority does not explicitly address the question whether appellant had to "intend" to encourage violence and tumult by his actions. But I think the opinion unmistakably implies that a person may be convicted under the D.C. riot statute if his actions are found to "aid and encourage" the violence even though he does *not* intend to do so.

though the majority opinion does not spell out the full implications of its theory, it seems clear that non-violent petit larceny is not the only activity which could be said to "aid and encourage" violent and tumultuous conduct.

It is true that the majority refers to the District Court's theory that

"one may 'engage in' violent or tumultuous conduct by *knowingly and intentionally* aiding or encouraging it 'by acts, gestures or words' \* \* \*."

Majority opinion at 1183 (emphasis added). But the majority immediately abandons that formulation in favor of an even broader reading of the statute which permits a "larcenous act" to be punished as riot solely because of the circumstances under which it is done and, apparently, without regard to the intent of the actor. Furthermore, the majority apparently finds a congressional intent—although it cites no support for its finding—that conduct such as appellant's will be "deemed" to have aided and encouraged violence. *Ibid.* Clearly under this formulation, a finding that the actor intended to encourage riot is not necessary. As a final indication that the intent of appellant is irrelevant to the majority's interpretation, the majority explicitly characterizes appellant's conduct as "foolish greed"—a characterization hardly consistent with a conscious intent to encourage violence. Thus, in my judgment, the entire thrust of the opinion suggests that no such intent need be found to sustain appellant's conviction.

Moreover, in this case I believe the majority is required to take this position in order to affirm appellant's conviction. There is no evidence that could sustain a finding of fact beyond a reasonable doubt that appellant intended to encourage violence, if we accept appellant's version of the facts as true. In fact, the only reasonable inference to be drawn from appellant's testimony is that he desired to leave the area with his package as quietly as possible and to have no impact at all on the surrounding events. Any other conclusion, based solely on appellant's version of the facts, would be complete speculation. *Cf.* Thompson v. City of Louisville, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960).

18. In addition to the problem of intent discussed in Note 17, I have another difficulty with the scope of the majority's interpretation: must the Government offer proof, and must the jury find, that appellant's conduct in fact encouraged vio-

The majority's interpretation seems to me to offer no sure guides to anyone for determining which conduct will violate the D. C. riot statute. It is impossible, in my judgment, to define precisely what activity "aids or encourages" [18] violence

lence? Portions of the majority opinion seem to create a presumption that activity such as appellant's encourages violence, thereby dispensing with the need for any proof on the question. Specifically, the majority argues that picking up and carrying away looted goods encourages and aids the tumult and violence condemned by the statute in the following ways: (1) it attracts people to the scene; (2) it harasses the police and diverts them from more compelling tasks; (3) it identifies the individual with the climate of violence and turmoil; and (4) it tempts others to engage in similar, or in violent, actions. I find it unclear whether these propositions are intended as findings of fact on the basis of the record in the present case, or whether they are intended, as in the case of legislative findings, to apply in all cases brought under the D.C. riot statute. In my view, there is no evidence in appellant's version of the facts which could support these findings on the basis of the present record.

Thus it seems that the majority rules as a matter of law that activity similar to appellant's is presumed to "encourage" tumult and violence without any need for proof (1) that anyone saw it, (2) that anyone was in fact encouraged by it, and (3) that violence or tumult occurred or increased following appellant's act. The precise effect of this presumption would be that appellant's action in picking up the bag of liquor would be "deemed" sufficient evidence that appellant "encouraged" violence. If the majority intends to create such a presumption, I believe serious constitutional problems are raised. *See* Leary v. United States, 395 U.S. 6, 32–36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969). Moreover, it is singularly inappropriate, in my judgment, for an appellate court to create statutory criminal presumptions since it is ill-equipped to undertake the necessary investigation and research. The *Leary* Court threw out a presumption—written into the Marihuana Tax Act by Congress—which authorized the jury to infer from a defendant's possession of marihuana that the drug was illegally imported into the United States and that the defendant knew of the illegal importation. And the Court invalidated this presumption despite its holding that

when there is no concert of purpose or common intent. In the present case, appellant testified that he picked up a bag containing liquor bottles and kept walking, anxious to get away from the scene of the disorder. Since appellant's version of the facts must be accepted as true in testing the propriety of his requested instruction, there is no evidence of common purpose, intent to aid or encourage violence, or unusual behavior on the part of appellant.

Some reliance is placed by the majority upon the fact that appellant's act was larcenous. Unfortunately, no explanation is provided of the significance of that fact.[19] Will any violation of any law be sufficient to support a conviction under the riot statute? Both littering[20] and walking in the street[21] are crimes in the District of Columbia. Moreover, both crimes are apparently typical of riotous activity. Under the majority's standard, could people who engage in these crimes be said to have aided and encouraged the violence which occurs during a disorder?

I raise these considerations only to emphasize the uncertainty of the majority's standard. In my judgment, it has provided no objective guides for determining what constitutes unconscious aid or encouragement as it uses those concepts. Certainly the majority's holding that concert of action is not required to violate the statute does not make the aider and abettor principle applicable to one who unintentionally "aids and encourages."[22] I turn, therefore, to consider the constitutional implications of the majority's conclusions.

## II

A. Initially it is useful to note the ways in which this statute is significantly broader than either the common law crime of riot or most state riot statutes. First, the D. C. statute does not include the common law requirement[23] of a common purpose or intent on the part of the rioters—a requirement that is also present in many state riot statutes.[24] This element of the crime was apparently dropped in order to deal with modern ghetto riots which have generally in-

"the congressional determination favoring [a] particular presumption must, of course, weigh heavily." 395 U.S. at 36, 89 S.Ct. at 1548. In the present case, if such a presumption is created it is created by the court and not by Congress, and I find it seriously vulnerable to constitutional attack. See generally Note, The Constitutionality of Statutory Criminal Presumptions, 34 U.Chi.L.Rev. 141 (1966).

19. Neither the statutory language nor the majority's interpretation restricts the reach of the D.C. riot statute to acts which violate other laws. Rather, the majority's formulation focuses on the question whether conduct "aided or encouraged" violence. Therefore, the fact that appellant's act was independently illegal is apparently relevant only to the extent that it bears on that question.

20. 1 D.C.Code § 224 (1967).

21. D.C. Traffic & Motor Vehicle Regulations, Part I, § 56(a) (1966).

22. See United States v. Garguilo, 2 Cir., 310 F.2d 249, 253 (1962); Cooper v. United States, 123 U.S.App.D.C. 83, 87,

357 F.2d 274, 278 (1966); Bruce v. United States, 126 U.S.App.D.C. 336, 340, 379 F.2d 113, 117 (1967).

See also Nye & Nissen v. United States, 336 U.S. 613, 619, 69 S.Ct. 766, 769–770, 93 L.Ed. 919 (1949): "In order to aid and abet another to commit a crime it is necessary that a defendant 'in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed.' L. Hand, J., in United States v. Peoni [2 Cir.], 100 F.2d 401, 402 [1938]."

23. For the classic definition of riot at common law, including the requirement of common intent, see 4 W. Blackstone, Commentaries *146 (1854); 46 Am.Jur. Riots and Unlawful Assembly, §§ 8, 11 (1943), and cases cited therein.

24. See, e. g., Calif.Penal Code § 404 (1872); 38 Ill.Ann.Stat. § 25–1 (1961); 21 Okla.Stat.Ann. § 1311 (1910). See generally Hearing on Anti-Riots before Subcommittee No. 4, House Committee on the District of Columbia, 90th Cong., 1st Sess., 30–65 (1967).

volved spontaneous acts by unallied individuals.[25]

Second, an act does not have to be independently prohibited by the criminal law in order to violate the D. C. riot statute. Several state riot statutes require that conduct be criminal independent of the riot statute before a person can be convicted of rioting.[26] One state law revision commission has specifically noted the usefulness of such a requirement as a device to limit the reach of a riot act.[27]

Finally, it is unclear from the statute whether an individual charged under it must himself do a violent or turbulent act.[28] The common law offense of riot did contain such a requirement, as do many state riot laws.[29] But if the D. C. statute is unclear, the majority's holding, as noted above, is not. Its interpretation removes any requirement that a defendant personally engage in violent or tumultuous conduct.

As interpreted, therefore, this statute does not require a common purpose, does not require that actions violating the statute be independently criminal, and does not require that the defendant himself commit violent or turbulent acts. Counsel have cited no cases, and I have found none, upholding the constitutionality of a riot statute which contained *none* of these clarifying and limiting provisions. In recent years, numerous three-judge District Courts have passed on the constitutionality of various state riot and unlawful assembly statutes. But in each case where the statute was upheld, the court found or read in one or more of these protective provisions.

In upholding the constitutionality of the Pennsylvania riot act, the three-judge District Court relied completely on the fact that the Pennsylvania courts had consistently given the potentially vague statute its common law meaning.[30] Moreover, the Pennsylvania courts apparently required that persons do an unlawful act of violence *and* act with a common intent in order to be convicted.[31] Similarly, a three-judge District Court upheld three sections of the Illinois Mob Action Statute against a constitutional challenge by reading the statute to require both (1) use of force or violence by the defendant, and (2) a common intent on the part of the assemblage.[32] Another three-judge court, in Carmichael v. Allen,[33] declined to enjoin a prosecution under the Georgia riot statute because the Georgia act "has been limited by several holdings of the Georgia courts solely to acts of violence by two or more persons acting in con-

25. *See* majority opinion at 1182 n. 5; National Advisory Commission on Civil Disorders, Report 7, 9 (1968).

26. *E. g.*, Mo.Ann.Stat. § 562.150 (1959), construed in Rollins v. Shannon, E.D.Mo., 292 F.Supp. 580 (1968) (three-judge court); Fla.Stat.Ann. § 870.02; Page's Ohio Rev.Code Ann. § 3761.13; Vernon's Texas Penal Code, Art. 455.

27. *See* Mich.Rev.Crim.Code § 5510(1) (1967), discussed in Comment, Michigan Revised Criminal Code and Offenses Against Public Order, 14 Wayne L.Rev. 986, 1000 (1968).

28. *See* Part III *infra*.

29. *E. g.*, 38 Ill.Ann.Stat. § 25–1(a) (1) (1961).

30. Heard v. Rizzo, E.D.Pa., 281 F.Supp. 720, 739, *affirmed mem.*, 392 U.S. 646, 88 S.Ct. 2307, 20 L.Ed.2d 1358 (1968).

31. *Id.* at 739–740.

32. Landry v. Daley, N.D.Ill., 280 F.Supp. 938, 954–955 (1968). Both the plaintiff and the defendant in *Landry* appealed the decision to the Supreme Court. Plaintiff's appeal, involving the three-judge court's holdings on the Illinois Mob Action Statute discussed in text, was dismissed on procedural grounds. Landry v. Boyle, 393 U.S. 220, 89 S.Ct. 455, 21 L.Ed.2d 392 (1968) (failure to file appeal within allowed time). The Court has noted probable jurisdiction on defendant's appeal involving issues not relevant to the present case. Boyle v. Landry, 393 U.S. 974, 89 S.Ct. 442, 21 L.Ed.2d 436 (1968).

33. N.D.Ga., 267 F.Supp. 985 (1967).

cert." [34] The Missouri Unlawful Assembly Statute was also held to be constitutional by a three-judge court.[35] But to avoid constitutional problems, the court construed the statute to require "that the persons involved have a specific intent, by force or violence, to do unlawful [criminal] acts." [36] Thus I find no support for the majority's holding in any federal or state cases involving state riot laws.[37] The heavy reliance in these cases upon the safeguards discussed above—indeed the fact that the courts were at pains to read these restrictions into the statutes—gives rise to an inference that a statute without any of these limitations is constitutionally suspect. Following the lead of these cases, I submit that the D. C. riot statute should be read narrowly to avoid the constitutional problem, not expansively to cover this case.

B. The evolution of the constitutional doctrines of vagueness and overbreadth reflects a number of distinct concerns. Foremost among these, as the Supreme Court has repeatedly emphasized, is the danger which vague statutes pose in their potential for deterring the exercise of constitutional rights.[38] Even if the statute does not explicitly proscribe constitutionally protected conduct, the uncertainty of the line it draws may deter men from exercising their rights. The self-enforcing character of vague statutes—the simple existence of such a statute may deter, unaided by any further step on the part of government—has led the Supreme Court to test vague statutes "on their face" to determine whether they chill constitutional rights.[39]

Traditionally, the Supreme Court's concern with the chilling effect of vague statutes has focused on First Amendment freedoms.[40] Unaided by a narrowing interpretation, or by any of the limiting safeguards discussed in Part II–A above, the D. C. riot statute clearly seems capable of deterring the basic right of freedom of assembly. On its face, the statute applies to *all* assemblies of five or more people involving violence or the threat of violence, which creates a risk of serious harm.

Some cases have suggested that a statute which requires violence before it can be invoked should be approved because the constitutional guarantee applies only to peaceable assembly.[41] That rule seems

---

34. *Id.* at 996 n. 10a.

35. Rollins v. Shannon, *supra* Note 26.

36. *Id.* at 591.

37. I have not considered any cases involving statutes proscribing incitement to riot since appellant is not charged with incitement pursuant to § (c) of the D. C. riot statute, 22 D.C.Code § 1122(c) (Supp. II 1969).

38. " * * * * To give these freedoms the necessary 'breathing space to survive,' * * * * the Court has modified traditional rules of standing and prematurity. * * * * We have molded both substantive rights and procedural remedies in the face of varied conflicting interests to conform to our overriding duty to insulate all individuals from the 'chilling effect' upon exercise of First Amendment freedoms generated by vagueness, overbreadth and unbridled discretion to limit their exercise." Walker v. City of Birmingham, 388 U.S. 307, 344–345, 87 S.Ct. 1824, 1844–1845, 18 L.Ed.2d 1210 (1967) (dissenting opinion of Mr. Justice Brennan). *See* Key-

ishian v. Board of Regents, *supra* Note 15; Cox v. Louisiana, *supra* Note 15; Baggett v. Bullitt, 377 U.S. 360, 372–373, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

39. *See* Note, The Void-for-Vagueness Doctrine in the Supreme Court, 109 U.Pa.L. Rev. 67, 96–97, 109 n. 224 (1960).

40. *See generally* Note, The Chilling Effect in Constitutional Law, 69 Colum.L.Rev. 808 (1969); cases cited Note 38 *supra*.

41. *See e. g.,* Landry v. Daley, *supra* Note 32, at 950: "[D]emonstrations lose their constitutional protection if the participants engage in violence." Any individual who personally engages in illegal violence may, of course, be arrested and punished. The question, however, is whether all participants in a demonstration may be prosecuted because some of their number become *violent.* Twenty years ago the Supreme Court, clearly troubled by the issue, expressly reserved decision on this question:

" * * * [W]e are not called upon to decide whether a state has power to incriminate by his mere presence an

proper where the statute applies only to those who actively engage in serious violence; such conduct is clearly not constitutionally protected and not to be condoned. But, as noted above, the statute presently before us is not, as the majority opinion interprets it, so limited. The only explicit requirement imposed by the D. C. statute is that there be serious violence or the threat of it somewhere in the assemblage. By not explicitly limiting its sanction to those directly engaged in violence or intentionally encouraging it, the statute may easily deter people from attending an assemblage at which violence *might* occur.[42] People would reasonably fear being swept up and arrested indiscriminately even if violence was perpetrated by outsiders or by other members of the assembly.

This danger is not averted solely by a requirement that the assemblage involve violence. Nor is it averted or lessened by the majority's requirement that a person "aid or encourage" the violence. The vagueness of this requirement offers no substantial guarantee of protection to an innocent, non-violent participant in the demonstration.[43] The majority opinion does, of course, assert that its interpretation does not reach the mere bystander or curious onlooker. But the problem is the person who in the exercise of his rights is a conscious, active participant in a demonstration. If violence erupts, has he aided and encouraged it

merely because he was a participant in what was to have been a peaceful demonstration? I submit that the vagueness of this requirement, and the fine distinctions which must, of necessity, be drawn in order to apply it, can easily deter the exercise of First Amendment freedoms. In my view, the constitutionality of the majority's interpretation is open to serious doubt on this count alone.

In addition to chilling the exercise of such First Amendment rights, the vagueness of the D. C. riot statute as interpreted seems likely to deter the exercise of other constitutional rights, such as freedom of movement, sometimes called the right to travel,[44] even in one's own neighborhood. Mr. Justice Douglas, writing for the Court in Kent v. Dulles,[45] emphasized

"how deeply ingrained in our history this freedom of movement is. Freedom of movement across frontiers in either direction, and inside frontiers as well, was a part of our heritage. Travel abroad, like travel within the country, may be necessary for a livelihood. It may be as close to the heart of the individual as the choice of what he eats, or wears, or reads. Freedom of movement is basic in our scheme of values. * * * " [46]

It is well to remember the setting in which this recent wave of disorders has occurred.[47] Almost uniformly, they are focused in poverty-stricken Negro resi-

innocent member of a group when some individual without his encouragement or concert commits an act of violence. * * * "

Cole v. Arkansas, 338 U.S. 345, 352, 70 S.Ct. 172, 176, 94 L.Ed. 155 (1949) (opinion of Mr. Justice Jackson).

42. The Supreme Court, of course, has often noted the necessity for careful and precise regulation in statutes affecting First Amendment freedoms: "Precision of regulation must be the touchstone in an area so closely touching our most precious freedoms." N.A.A.C.P. v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 340, 9 L.Ed.2d 405 (1963).

43. Compare the situation of a person who desires to be an active participant in a demonstration where violence might occur

with that of a person who desires to be a member of a political organization which might have illegal aims and goals. *See* United States v. Robel, 389 U.S. 258, 88 S.Ct. 419, 19 L.Ed.2d 508 (1967) ; Scales v. United States, 367 U.S. 203, 224–228, 81 S.Ct. 1469, 6 L.Ed.2d 782 (1961).

44. *See* the full discussion of the right to travel in Shapiro v. Thompson, 394 U.S. 618, 629–631, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969).

45. 357 U.S. 116, 78 S.Ct. 1113, 2 L.Ed. 2d 1204 (1958).

46. 357 U.S. at 126, 78 S.Ct. at 1118.

47. *See, e. g.,* National Advisory Commission, *op. cit. supra* Note 25; B. Gilbert, *op. cit. supra* Note 14; R. Conot, Rivers of Blood, Years of Darkness (1967).

dential neighborhoods. The stores which are looted and burned are local stores, often with residences in the upper floors of the buildings which they occupy. It is neither unusual nor improper for there to be large numbers of people in the vicinity: they live there. Moreover, most of these neighborhoods are desperately overcrowded; on the hot summer days and nights on which disturbances typically occur, it is natural that many people are out on the stoops or in the streets. Travel to work and to food stores brings others outside into the streets. Finally, as reports of rioting, shooting and arrests are heard, men and women in the affected areas often go out in search of members of their families who they fear may have been caught up in the maelstrom.[48] One recent riot study found that about 50 per cent of people arrested on riot-related charges were arrested within five blocks of their homes; more than three quarters were arrested within 20 blocks of their homes.[49]

In appraising the vagueness of the D. C. riot statute, it should, therefore, be understood that the law may often apply to people in their own neighborhoods. Its vagueness and failure to regulate conduct precisely threatens people with arrest merely for going outside their homes, even for legitimate purposes. Individuals may properly fear that exercise of their rights peacefully to use the public streets to obtain food, to go to work, or to locate their families will expose them to arrest on a serious criminal charge.

The vagueness of the D. C. statute also produces other evils. It virtually eliminates the possibility of review of the actions of judges and juries. The vague standard of guilt articulated by the statute, and by the majority opinion in this case, "licenses the jury to create its own standard in each case."[50] This problem derives essentially from the failure to spell out the necessary connection between the individual's actions and the assemblage's violence. What are the standards by which the policeman, the prosecutor, the judge and the jury are to determine whether an individual's conduct tended to "encourage" violence? The jury seems to be turned loose to speculate on the connection between the defendant's conduct and the violence admittedly wreaked by others in the assemblage.

The present case demonstrates the danger. If the jury believed appellant's story, then, on the majority's interpretation, it had to answer the question whether picking up a bag of liquor, at the side of a store, off the street from where the main action was occurring, "aided or encouraged" the violence going on there. There was, of course, no evidence introduced that anyone saw appellant pick up the liquor or that he did it in an ostentatious or flagrant manner. His testimony, that he wanted to get away from the store quickly, would tend to indicate the reverse. It is entirely possible, therefore, that on this state of the record the jury simply speculated about the relationship of the defendant's conduct to the violence on Eighth Street. Particularly in this type of case, where the very charge of riot is likely to inflame deep feelings, the courts must assess carefully the guidelines provided to

48. For example, one recent study of the women arrested in connection with Washington's April Riots found that most were not outside bent on illegal errands, particularly those arrested for curfew violations. Miller, The Woman Participant in Washington's Riots, 33 Federal Probation 30, 33 (June 1969). Even those who looted often could not be compared with ordinary criminals:

"* * * One woman [looter] * * * always did her weekend shopping after work on Friday at the only large grocery in her neighborhood. The store was being looted when she arrived. She explained that she was faced with the choice of not looting and not having any food for the weekend or taking what she ordinarily would have purchased." *Ibid.*

49. Comment, *supra* Note 14, 36 U.Chi.L. Rev. at 493.

50. Herndon v. Lowry, 301 U.S. 242, 263, 57 S.Ct. 732, 741, 81 L.Ed. 1066 (1937).

a jury. The wide-ranging 'discretion handed the jury under this statute, as interpreted, seems extraordinarily unrestricted and peculiarly dangerous.

Similar dangers inhere in the potential for discriminatory and prejudiced exercise of authority by police and prosecutor under such a statute. It appears that at the time of the riots in the District of Columbia the prosecutor exercised the broad discretion given to him under this statute with restraint.[51] But under a government of written law, defendants have never been consigned to the tenuous and transitory protection of the wisdom of prosecuting officials.[52] The discretion that today is wisely employed may become the basis of prejudice and discrimination tomorrow. Moreover, innumerable studies of civil disorders in Negro communities have demonstrated that those disorders are in large measure due to the abuse of discretion by law enforcement officials.[53] Yet in the very statute dealing with these disorders which so sharply and violently demonstrate the legacies of the past, the majority opinion would once again countenance virtually unbridled discretion on the part of police and prosecutor. Given such a broad and general mandate, it seems possible for any person arrested on any grounds during a disturbance to be charged under this statute. Without some objective standards, the prosecutor will be in a position to charge persons arbitrarily, the jury will be able to convict or not depending entirely on extralegal considerations, and an appellate court will be able to do little to supervise or control such a process.

### III

In view of these constitutional considerations, I would interpret this statute by strict adherence to the statutory language enacted by Congress.[54] To violate the Act a person must "engage in a riot." According to Webster's Third New International Dictionary, "engage" means to "employ or involve oneself," "to take part." [55] With reference to violence,

---

51. *See majority opinion at* 1183 n. 10.

52. In fact, the existence of great discretion in the hands of executive officials in areas affecting First Amendment freedoms has often been condemned by the Supreme Court. *See* Shuttlesworth v. Birmingham, 394 U.S. 147, 151, 89 S.Ct. 935, 22 L.Ed.2d 162 (1969) ; Staub v. City of Baxley, 355 U.S. 313, 78 S.Ct. 277, 2 L.Ed.2d 302 (1958).

53. " * * * [D]eep hostility between police and ghetto communities [was] a
 * * * * *
primary cause of the disorders surveyed by the Commission. * * *
 * * * * *
"The policeman in the ghetto is a symbol not only of law, but of the entire system of law enforcement and criminal justice.
"As such, he becomes the tangible target for grievances against shortcomings throughout that system : against assembly-line justice in teeming lower courts; against wide disparities in sentences * * *."
National Advisory Commission, *op. cit. supra* Note 25, at 299.

54. There is no legislative history to suggest that the statute's language should be read broadly or accorded anything except its ordinary meaning. The D. C. riot statute was enacted as Title IX of the District of Columbia Crime Act of 1967. Title IX was not in the first version of the law passed by the House and was not considered by the full House Committee on the District of Columbia. 113 Cong. Rec. (Part 13) 17207–17209 (1967). While Title IX was in the Senate bill as recommended by the Senate District Committee, there was no debate of the provision on the floor of the Senate, 113 Cong.Rec. (Part 26) 36061–36079 (1967), and the Committee report urged its adoption in a generalized denunciation of "[r]ioting, burning, looting, and killing." S.Rep. 912, 90th Cong., 1st Sess., at 26 (1967). The House subsequently concurred in the Senate version of the entire crime bill without any debate at all. 113 Cong.Rec. (Part 27) 36408–36409 (1967). The only reported hearings on the riot statute were held by a House subcommittee, and these brief hearings focused almost exclusively on the statute's penalties and on its section which punishes inciting to riot. Hearing, *supra* Note 24.

55. Webster's Third New International Dictionary 751 (1961).

Webster's defines "engage" as meaning "to enter into conflict," to "join battle." [56] Thus the usual meaning of "engage" denotes active and full participation and involvement in an activity, not mere unwitting aid or encouragement.[57]

When the Act's Section (b) requirement that a person "engage in a riot" is read in conjunction with Section (a)'s definition of a riot, the statute requires that a person "engage in" a

> "public disturbance involving an assemblage of five or more persons which by tumultuous and violent conduct or the threat thereof creates grave danger of damage or injury to property or persons.'" [58]

At a minimum, the statute requires that a person "engage in" a public disturbance. Given the meaning of "engage" as well as cases interpreting disorderly conduct statutes,[59] I think it quite clear that a person's own conduct should have to amount to a breach of the peace in order to qualify as "engaging" in a public disturbance. The word "involving" leaves ambiguous, however, the question whether the conduct required by the statute must not only be a breach of the peace but must also be violent and tumultuous conduct which poses the required threat of harm. Here I am swayed by four factors: (1) the use of the word "engage" with its connotation of full and complete immersement in an activity; (2) the exclusion from the statute of the common law element of common purpose and intent; (3) the severe constitutional problems posed by this statute in the absence of some objective limits to its reach; and (4) the accepted axiom that criminal laws are to be strictly construed. I would, therefore, read the statute to require proof that the defendant was guilty of "violent and turbulent conduct" which constitutes a breach of the peace and poses a clear and present danger of serious property damage or serious personal injury. I submit that my view is more faithful to the statutory language and much less beset with serious constitutional problems than the majority's expansive interpretation.

Under my reading of the statute, it is clear that appellant's account of his conduct could not be brought within its terms. Therefore, he was entitled to have the jurors instructed that, if they

**56.** *Ibid.*

**57.** In arguing that the word "engage" is not vague, the Government pointed out that the word was used in other District of Columbia and federal statutes. The cases I have found interpreting "engage" in the context of these statutes all support a reading of the word which requires full participation and involvement. *See, e. g.,* Stone v. District of Columbia, 123 U.S.App.D.C. 291, 359 F.2d 275 (1966) (defendant was personally committing breach of peace to "engage" in disorderly conduct under 22 D.C.Code § 1107); Dane v. United States, 57 App.D.C. 161, 18 F.2d 811 (1927) (defendant who arranged and collected admission fee to prize fight did not "engage in a pugilistic encounter * * * for money" but was guilty under aiding and abetting principles). In Landry v. Daley, *supra* Note 32, the court found that "engage" meant "to occupy, to employ, or to involve," 280 F.Supp. at 956, and that being "engaged in" implied fuller involvement than being "a participant" in the same activity. *Id.* at 957. *See also* Kelly v. Illinois

Bell Telephone Co., N.D.Ill., 210 F.Supp. 456, 466 (1962).

**58.** 22 D.C.Code § 1122(a) (Supp. II 1969).

**59.** *See* Edwards v. South Carolina, 372 U.S. 229, 83 S.Ct. 680, 9 L.Ed.2d 697 (1963); Terminiello v. City of Chicago, *supra* Note 13; Baker v. Bindner, W.D. Ky., 274 F.Supp. 658, 663 (1967); Carmichael v. Allen, *supra* Note 33, 267 F.Supp. at 997–998. The draftsmen of the Model Penal Code have reached exactly the same conclusion set out in text. The Model Penal Code's formulation of both disorderly conduct and riot statutes closely resembles the language of the D. C. riot statute. In the Comments to the Code's provisions, the draftsmen explicitly note that the disorderly conduct statute "penalizes only behavior which is itself disorderly" and follow a similar policy in the Code's riot provision. American Law Institute, Model Penal Code § 250.1, Disorderly Conduct; Riot, Comment 2 at 8 and Comment 6 (Tentative Draft No. 13, 1961). *See also* the cases cited therein.

believed his story, they had to return a verdict of not guilty on the riot count. Since the trial court denied his request for such an instruction, I believe appellant is entitled to a new trial.

I respectfully dissent.