D. C. FEDERATION OF CIVIC ASSO-
CIATIONS, INC., et al., Appellants,

v.

John A. VOLPE et al.

No. 23870.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 25, 1970.

Decided April 6, 1970.

Mr. Roberts B. Owen, Washington, D. C., with whom Mr. Gerald P. Norton,

Washington, D. C., was on the brief, for appellants.

Mr. Thomas L. McKevitt, Attorney, Department of Justice, with whom Messrs. Thomas A. Flannery, U. S. Atty., Joseph M. Hannon, Asst. U. S. Atty., and Edmund B. Clark, Attorney, Department of Justice, were on the brief, for federal appellees.

Mr. John R. Hess, Asst. Corporation Counsel for the District of Columbia, with whom Messrs. Charles T. Duncan, Corporation Counsel, Hubert B. Pair, Principal Asst. Corporation Counsel, and Richard W. Barton, Asst. Corporation Counsel, were on the brief, for District of Columbia appellees.

Messrs. Bruce L. Montgomery and Richard J. Wertheimer, Washington, D. C., filed a statement on behalf of Sierra Club, et al., as amici curiae.

Before BAZELON, Chief Judge, and WRIGHT and MacKINNON, Circuit Judges.

J. SKELLY WRIGHT, Circuit Judge:

This suit concerns the interpretation of Section 23 of the Federal-Aid Highway Act of 1968.[1] In that section Congress directed the District of Columbia government and the Secretary of Transportation to construct certain of the remaining portions of the Interstate Highway System in the District. Among the projects mentioned in the Act was the Three Sisters Bridge, a proposed span across the Potomac River upstream from Key Bridge crossing from Spout Run in Virginia to the Georgetown section of Washington.

The Act became law with the signature of the President on August 23, 1968. In September of 1969 the District let the first contracts for building the Three Sisters Bridge. Taxpayers and civic associations in the District brought this suit in October of 1969 for a declaratory judgment and for injunctive relief. Appellants alleged that the Secretary of Transportation and the District government were building the Bridge in violation of several provisions of Title 23 of the United States Code.

After an expedited hearing the District Court refused to grant the injunction and granted summary judgment for appellees. The court concluded that appellants' allegations of violations of Title 23 would not be considered because "Congress intended [by enacting Section 23] that the District of Columbia commence construction on the Bridge project as soon as possible, and that no further planning or hearing requirements of Title 23 need be complied with."[2] Because we do not find that Congress intended to deny the residents of the District of Columbia the protections accorded all United States citizens by Title 23, we reverse the decision of the District Court and remand the cause for hearings to determine whether there has been compliance with Title 23 in this case.

I

Section 23 of the Federal-Aid Highway Act of 1968 provides as follows:

## DISTRICT OF COLUMBIA

Sec. 23. (a) Notwithstanding any other provision of law, or any court decision or administrative action to the contrary, the Secretary of Transportation and the government of the District of Columbia shall, in addition to those routes already under construction, construct all routes on the Interstate System within the District of Columbia as set forth in the document entitled "1968 Estimate of the Cost of Completion of the National System of Interstate and Defense Highways in the District of Columbia" submitted to Congress by the Secretary of Transportation with, and as a part of, "The 1968 Interstate System Cost Estimate" printed as House Document Numbered 199, Ninetieth Congress. Such construction shall be un-

---

1. Pub.L. No. 90–495, 82 Stat. 827–828 (1968).

2. D. C. Federation of Civic Associations v. Volpe, D.D.C., 308 F.Supp. 423 (1970).

438

dertaken as soon as possible after the date of enactment of this Act, except as otherwise provided in this section, and shall be carried out in accordance with all applicable provisions of title 23 of the United States Code.

(b) Not later than 30 days after the date of enactment of this section the government of the District of Columbia shall commence work on the following projects:

(1) Three Sisters Bridge, I–266 (Section B1 to B2).

(2) Potomac River Freeway, I–266 (Section B2 to B4).

(3) Center Leg of the Inner Loop, I–95 (Section A6 to C4), terminating at New York Avenue.

(4) East Leg of the Inner Loop, I–295 (Section C1 to C4), terminating at Bladensburg Road.[3]

Appellees argue strenuously that Section 23 was intended to eliminate the necessity for compliance with the "pre-construction" provisions of Title 23 of the United States Code in building the Three Sisters Bridge. Specifically, appellees urge that, despite the explicit statement in Section 23 that "all applicable provisions" of Title 23 are to govern the project, the following sections of Title 23, while applicable to similar projects throughout the country, are inapplicable to the Three Sisters Bridge project[4]: (1) 23 U.S.C. § 128(a) (Supp. IV 1965–1968), which requires any state[5] building a federally financed road to hold public hearings as to design and location of any proposed highway or bridge, and to consider the "economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban

3. The rest of the section reads as follows:
(c) The government of the District of Columbia and the Secretary of Transportation shall study those projects on the Interstate System set forth in "The 1968 Interstate System Cost Estimate", House Document Numbered 199, Ninetieth Congress, within the District of Columbia which are not specified in subsection (b) and shall report to Congress not later than 18 months after the date of enactment of this section their recommendations with respect to such projects including any recommended alternative routes or plans, and if no such recommendations are submitted within such 18-month period then the Secretary of Transportation and the government of the District of Columbia shall construct such routes, as soon as possible thereafter, as required by subsection (a) of this section.
(d) For the purpose of enabling the District of Columbia to have its Federal-aid highway projects approved under section 106 or 117 of title 23, United States Code, the Commissioner of the District of Columbia may, in connection with the acquisition of real property in the District of Columbia for any Federal-aid highway project, provide the payments and services described in sections 505, 506, 507, and 508 of title 23, United States Code.
(e) The Commissioner of the District of Columbia is authorized to ac-

quire by purchase, donation, condemnation or otherwise, real property for transfer to the Secretary of the Interior in exchange or as replacement for park, parkway, and playground lands transferred to the District of Columbia for a public purpose pursuant to section 1 of the Act of May 20, 1932 (47 Stat. 161; D.C.Code, sec. 8–115) and the Commissioner is further authorized to transfer to the United States title to property so acquired.
(f) Payments are authorized to be made by the Commissioner, and received by the Secretary of the Interior, in lieu of property transferred pursuant to subsection (e) of this section. The amount of such payment shall represent the cost to the Secretary of the Interior of acquiring real property suitable for replacement of the property so transferred as agreed upon between the Commissioner and the head of said agency and shall be available for the acquiring of the replacement property.

4. Appellants have also argued that other sections of Title 23, for example, § 317, also apply. In text we discuss only three sections for the sake of clarity. But our holding applies to all of Title 23.

5. For purposes of Title 23, the District of Columbia is considered to be a "state." 23 U.S.C. § 101 (1964).

planning as has been promulgated by the community"; [6] (2) 23 U.S.C. § 134 (1964), which requires the Secretary of Transportation to withhold approval of new highway projects unless and until he has made an explicit finding that "such projects are based on a continuing comprehensive transportation planning process carried on cooperatively by States and local communities in conformance with the objectives stated in this section"; and (3) 23 U.S.C. § 138 (Supp. IV 1965–1968), which requires the Secretary of Transportation to withhold approval of projects involving the use of park land "unless there is no feasible and prudent alternative to the use of such land, and * * * such program includes all possible planning to minimize harm to such park * * * resulting from such use."

If we were to accept appellees' interpretation of Section 23, we would be confronted with difficulties, possibly of constitutional magnitude. The provisions listed above are the essential safeguards which Congress has established, on a nationwide basis, to ensure that massive freeway projects are not constructed unless there has been a good faith effort on the part of the state and local planners to take community needs and resources into consideration. Congress has directed the planners to design projects consistent with growth and development patterns, to refrain from any unnecessary destruction of valuable state or local park land, and, most importantly, to accord area residents a full and fair hearing. The Secretary of Transportation is charged with overseeing the planning and may not approve road projects, thus allowing them to be built with federal funds, until he finds that all these considerations have been properly taken into account.

The net effect of Section 23, construed as appellees insist it must be, is to divide citizens of the United States affected by road projects into two classes. One small group of citizens, the residents of the District of Columbia who will be affected by the Three Sisters Bridge, is deprived of these important rights to participate in planning the future of the community. The other class, consisting of all residents of the 50 states, still retains these federally guaranteed rights to influence all federally assisted road building. On its face, therefore, appellees' interpretation of Section 23 would result in discrimination between the District residents affected by the Bridge and all other residents of the United States affected by highway projects in their localities.

The finding of such a discrimination, however, must be only the starting point of our inquiry. In the constitutional sense, many discriminations are simply benign. The question remains whether this discrimination is based on an invidious classification between groups of citizens which rises to the level of a violation of the equal protection clause of the Constitution.[7] We find that appellees' interpretation of Section 23 would endanger its constitutionality. We reject that interpretation to save the statute.

We start our analysis by explicitly recognizing, as the Supreme Court has announced on many occasions, that it is not every legislative discrimination between similarly situated groups which is violative of equal protection guarantees.[8] The legislative branches of government, state and federal, must be given great freedom in choosing how to overcome a designated evil. The latitude given the legislature

6. The statute requires the states to hold "public hearings"; the regulations specify separate location and design hearings. 23 C.F.R. Part 1, Appendix A (1970). For a discussion of the applicability of these regulations to this project, see pp. 447–448 infra.

7. See Shapiro v. Thompson, 394 U.S 618, 641–642, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

8. See, e. g., Williamson v. Lee Optical Co., 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

in enacting schemes of economic regulation has been especially broad.[9]

■ But while eschewing a close review of economic regulation, the Court has explicitly stated that it will apply "strict scrutiny," [10] a much more searching standard of review, when "individual and personal" [11] or "fundamental" [12] rights are involved. As the Court recently explained, in economic regulation cases "the Court has merely asked whether there is any rational foundation for the discrimination, and has deferred to the wisdom of the state legislatures." [13] When fundamental and personal rights are at stake, however, the statute can only be sustained by meeting "the very heavy burden of justification." [14] In at least some of these cases the discrimination "must be shown to be *necessary* to the accomplishment of some permissible state objective" [15] (emphasis added) if the statute is to pass constitutional muster.[16] We think that the interpretation of Section 23 which appellees urge would unnecessarily deny District residents important personal rights granted by Title 23 to citizens elsewhere in the United States.

■ All provisions of Title 23 discussed above were enacted primarily for the benefit of the local residents whose homes and lives may be affected by a national highway construction project. These provisions were designed to keep federally assisted highways from encroaching on local parks, from being located except in accordance with an inter-community scheme of comprehensive planning, and to make sure that state planning officials are apprised of the nature and depth of local residents' feelings about the wisdom of a particular project. The legislative history of the hearing provision as it was originally enacted 20 years ago shows that Congress

9. With reference to economic legislation, the Supreme Court has said that "[a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it." McGowan v. Maryland, 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). In overseeing economic legislation, where the ways of reaching a particular goal for the legislature are almost countless, and where close judicial examination of the means chosen by the legislature can only result in a resurgency of the second guessing of the legislature inherent in the concept of "substantive due process," the judiciary must of necessity avoid close scrutiny of these schemes lest it become only a super-legislature. *See* Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1128, 1131–1132 (1969).

10. Skinner v. Oklahoma ex rel. Williamson, 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

11. Reynolds v. Sims, 377 U.S. 533, 561, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

12. Harper v. Virginia Board of Elections, 383 U.S. 663, 667, 86 S.Ct. 1079, 16 L.Ed. 2d 169 (1966), quoting Yick Wo v. Hopkins, 118 U.S. 356, 370, 6 S.Ct. 1064, 30 L.Ed 220 (1886).

13. Loving v. Virginia, 388 U.S. 1, 9, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010 (1967); *see* McLaughlin v. Florida, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964).

14. Loving v. Virginia, *supra* Note 13, at 9, 87 S.Ct. at 1822. Professor Cox has written that these modern equal protection cases "appear to rest upon two largely subjective judgments, * * * the relative invidiousness of the particular differentiation, * * * [and] the relative importance of the subject with respect to which equality is required." Cox, Foreword: Constitutional Adjudication and the Promotion of Human Rights, 80 Harv. L.Rev. 91, 95 (1966).

15. Loving v. Virginia, *supra* Note 13, at 11, 87 S.Ct. at 1823; *see* Carrington v. Rash, 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed. 2d 675 (1965).

16. A commentary has summarized the recent cases as follows: "Thus, the cases indicate that when a fundamental interest is impaired or a suspect distinction drawn, the Court will demand a convincing demonstration that the classification is well tailored to achieve the statutory objective. How well tailored the classification must be remains somewhat obscure. The state must show at least that this classification is more than just one of several reasonable ways of achieving its goal." Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1122 (1969).

was concerned lest state and federal planners, thinking only of the needs of an efficient and fast nationwide highway network, fail to consider the specific particularized needs of the local communities affected by the projects.[17] As a result Congress required each state to hold public hearings at which the affected residents could demonstrate, in an orderly, regularized procedure, the community's particular requirements which the planners ought to take into account.

This hearing requirement applied to all federally aided highways. Just recently, as part of the Federal-Aid Highway Act of 1968, Congress again explicitly broadened the scope of the required hearing.[18] The present statute,[19] as interpreted by the Secretary's regulations,[20] now requires the states to hold both location and design hearings. Furthermore, the statute requires the states to have "considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community." [21] This history shows a long-standing and ever increasing congressional concern that highway planners be directly and publicly confronted with opposing views, to ensure that the planners take close account of the objections and desires of individual citizens affected by the proposed projects during the planning process.

Given this expression of legislative intent, we cannot say that this right of citizen participation in the highway planning process is an unimportant right, easily to be discarded. Those who are concerned with and most immediate-ly affected by federal highway projects have been accorded an opportunity to both commend and criticize planned highway construction projects, projects which are inherently disruptive of the status quo in any community. According to appellees, however, Congress, while broadening (in the Highway Act of 1968) this federally enforced right to a hearing, has at the same time deprived one small group, the citizens of the District of Columbia, of this right to be heard.

These provisions of Title 23 are the only form of direct citizen participation in decisions about the construction of massive freeways, decisions which may well have more direct impact on the lives of residents than almost any other governmental action. Public hearings are the forum ordained by Congress in which citizens, particularly the citizens of the District of Columbia, participate in highway planning decisions. The Supreme Court has made it clear in a series of cases that the right of effective participation in the political process "is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." [22] These rights, according to the Court, are "individual and personal," [23] they touch a "sensitive and important area of human rights," [24] and they involve the "basic civil and political rights" [25] of citizens. Any classifications which "might invade or restrain" these "fundamental rights and liberties * * * must be closely scrutinized and carefully confined." [26]

We think these Supreme Court decisions must guide our analysis of the lan-

---

17. *See* S.Rep.No.2044, 81st Cong., 2d Sess. 8 (1950).

18. *See* Federal-Aid Highway Act of 1968 § 24, Pub.L. No.90-495, 82 Stat. 828 (1968).

19. 23 U.S.C. § 128 (Supp. IV 1965-1968).

20. 23 C.F.R. Part 1, Appendix A (1970).

21. 23 U.S.C. § 128.

22. Reynolds v. Sims, *supra* Note 11, 377 U.S. at 555, 84 S.Ct. at 1378.

23. *Id.* at 561, 84 S.Ct. 1362, 1381.

24. *Id.* at 561, 84 S.Ct. at 1381, quoting Skinner v. Oklahoma ex rel. Williamson, *supra* Note 10, 316 U.S. at 536, 62 S.Ct. 1110.

25. Reynolds v. Sims, *supra* Note 11, at 562, 84 S.Ct. 1362.

26. Harper v. Virginia Board of Elections, *supra* Note 12, 383 U.S. at 670, 86 S.Ct. at 1083.

guage of Section 23. The preservation of a democratic form of government requires all concerned to protect the right of each citizen to influence the decisions made by his government. Since this case involves the right of citizens to participate in the political process as it relates to federal highway projects, we subject this statute to the same scrutiny we would apply to any legislative effort to preclude some, but not all, citizens' participation in decision making.[27]

We of course recognize that the right to participate in a highway hearing is not the exact equivalent of the right to vote on the project. However, the similarities between voting and the public hearing are strong. The purpose and the effect of a hearing may be the same as those of a vote. Both are designed to elicit the wishes of the "electorate." Furthermore, we take judicial notice of the fact that public hearings have often-

times resulted in the abandonment or redesign of ill conceived projects.

■ Presumably Congress could have given citizens affected by federal highway projects the right to vote thereon.[28] Instead Congress has sought to channel the comments and criticisms of individual citizens concerning road projects into a public hearing. This formal, regularized procedure, with due notice to all concerned, subjects officials to the differing views of competing interest groups and forces them to take account of prevailing views while the project plans are still being formulated.[29] Clearly Congress would not have insisted on such a procedure unless it intended to expose the road builders quite closely to the direct participation of citizens in the formulation of their decisions, in accord with the theory of our democratic process. Since these road projects may irreparably affect or destroy basic rights

27. This close analysis is not unavailable because the rights in this case are derived only from statutes. In Harper v. Virginia Board of Elections, *supra* Note 12, the Supreme Court proceeded on the explicit assumption that the state had no constitutional duty to allow its citizens to vote, but had allowed some to vote as a matter of legislative grace. In holding such action violative of equal protection, the Court stated: "For it is enough to say that once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause * * *." 383 U.S. at 665, 86 S.Ct. at 1081. It is settled law that "the State, having made [a procedural right] generally available on this issue, may not, consistent with the Equal Protection Clause of the Fourteenth Amendment, arbitrarily withhold it from some." Baxstrom v. Herold, 383 U.S. 107, 111, 86 S.Ct. 760, 762–763, 15 L.Ed. 2d 620 (1966). *See* Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

28. There is, of course, no constitutional right of citizens of the United States to vote on federally supported highway projects. Nor do District citizens have a constitutional right to vote generally. *See* Carliner v. Board of Commissioners of the District of Columbia, D.D.C., 265 F.Supp. 736 (1967), *affirmed,* 134 U.S.App.D.C. 43, 412 F.2d 1090 (1969). The point

here is that Congress, having by statute accorded all citizens the right to participate in the determination of highway projects, may not deny District citizens alone that right without adequate justification for this discrimination. *See* Note 27, *supra.*

29. *Compare* Office of Communication of United Church of Christ v. F. C. C., 123 U.S.App.D.C. 328, 359 F.2d 994 (1966). There we allowed listeners to intervene as parties in F.C.C. hearings in order to ensure that the F.C.C. fulfilled its duty to take the public interest into account. Rights of full and active participation in the hearings were deemed essential by the court:

"We cannot believe that the Congressional mandate of public participation which the Commission says it seeks to fulfill was meant to be limited to writing letters to the Commission, to inspection of records, to the Commission's grace in considering listener claims, or to mere non-participating appearance at hearings. We cannot fail to note that the long history of complaints against WLBT beginning in 1955 had left the Commission virtually unmoved * * *. Such beneficial contribution as these Appellants, or some of them, can make must not be left to the grace of the Commission."

123 U.S.App.D.C. at 338, 359 F.2d at 1004. (Footnotes omitted.)

—for example, the basic right of a citizen to live in his home—we must carefully and meticulously scrutinize any proposal which would deny to some the federally created right to influence the course of a highway in their neighborhood to determine whether this discrimination is "necessary to the accomplishment" of the congressional objective—a federally financed interstate highway system.

Appellees argue that Congress intended by enacting Section 23 to bypass the hearing process because hearings would only expose community sentiment adverse to the construction of the Bridge, and that Congress intended that the Bridge be built irrespective of the wishes of the citizens of the District of Columbia. Appellees further argue that to allow a public hearing would cause the local authorities to delay the Bridge, and that Congress meant to preclude hearings for this reason as well.

Such a reading of the statute would condemn it as unconstitutional. A legislature may not constitutionally disenfranchise a group of citizens because of their expected views: " 'Fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible. '[T]he exercise of rights so vital to the maintenance of democratic institutions,' * * cannot constitutionally be obliterated because of a fear of the political views of a particular group of bona fide residents." Carrington v. Rash, 380 U.S. 89, 94, 85 S.Ct. 775, 779, 13 L.Ed. 675 (1965).

In addition to giving closer review to classifications involving individual rights, the Court has also imposed a higher burden of justification on some forms of classification which are "constitutionally suspect" [30] or "traditionally disfavored." [31] If we were to accept appellees' reading and interpretation of Section 23, Congress would have excluded from the statutory protection only one group, a totally unrepresented and voiceless minority of citizens. Any legislative classification which singles out for invidious treatment a small group of citizens totally excluded from the political process does not meet the usual deference from this court. The usual deference which courts accord legislative and administrative judgments stems from the confidence which courts have that these judgments are just resolutions of competing interests.[32] In the *Carolene Products* case, the Supreme Court pointedly raised the question "whether prejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities, and which may call for a correspondingly more searching judicial inquiry." [33]

Because the resulting classification would deprive only an already voiceless minority of its important personal right to contest disruptive highway projects enjoyed by citizens generally, we conclude that we would be hard pressed to find on this record reasons adequate to sustain the "heavy burden of justification" necessary to support the discrimination which would result from appellees' interpretation of Section 23. Appellees argue that "justification" in this case stems from Congress' desire to have the Bridge built as soon as practicable. However, if this were found to be the

---

30. McLaughlin v. Florida, *supra* Note 13, 379 U.S. at 192, 85 S.Ct. 283, quoting Bolling v. Sharpe, *supra* Note 7, 347 U.S. at 499, 74 S.Ct. 693, 98 L.Ed. 884. *See* Thompson v. Shapiro, D.Conn., 270 F. Supp. 331, 337, affirmed, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

31. Harper v. Virginia Board of Elections, *supra* Note 12, 383 U.S. at 668, 86 S.Ct. 1079, 16 L.Ed.2d 169.

32. Hobson v. Hansen, D.D.C., 269 F.Supp. 401, 507 (1967), affirmed *sub nom.* Smuck v. Hobson, 132 U.S.App.D.C. 372, 408 F.2d 175 (1969).

33. United States v. Carolene Products Co., 304 U.S. 144, 153 n.4, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938).

intent of Congress, we would have to consider whether a less burdensome alternative path to the same end might have been possible.[34] For example, Congress might have obtained speedy construction, and preserved the rights of citizen participation and comment, simply by requiring that all hearings and Title 23 determinations be concluded with reasonable promptness. Other possible "justifications" may be dredged up from the legislative history of the statute in an attempt to balance off the invidiousness of the discrimination for which appellees contend. We do not stop to search them out because we are convinced that appellees' position that Congress intended such discrimination is unsupported by the language and history of the statute.

## II

■ Considering the statute as it was written, we do not read Section 23 as foreclosing the orderly procedures prescribed by Title 23. Appellees' primary argument to the contrary is that the statute directs "construction" of all the Interstate projects in the District. On the four projects mentioned in Section 23(b), including the Three Sisters Bridge, "work" was to commence within 30 days. Appellees attempt to draw a negative inference from Congress' assurance that "construction" was to be carried out in accordance with "all applicable provisions" of Title 23. Since, appellees argue, Congress only said that "construction" was to be in accordance with Title 23, it must have meant that all "pre-construction" provisions of Title 23 were somehow repealed as to these projects in the District of Columbia. We cannot agree. To our mind, any repeal of the provisions of Title 23 would have to be supported by more substantial evidence. Moreover, our interpretation conforms with the language of the statute read in the light of Title 23 which shows that "construction" includes planning.[35] We hold that Title 23 applies to all phases of the Three Sisters Bridge project.

■ The authoritative legislative history supports our interpretation.[36] The Senate and House reports do not indicate that any provisions of Title 23 are not to apply.[37] (The Conference Report contains no analysis of the bill as passed.[38])

---

34. *See* Carrington v. Rash, *supra* Note 15.

35. Expenses of "construction" include "all expenses incidental to the construction or reconstruction of a highway, including locating, surveying, and mapping * * *, [and] costs of rights of way." 23 U.S.C. § 101. Engineering costs, and the expenses of other activities, such as public hearings, which clearly take place long before what the statute defines as "actual building" (23 U.S.C. § 101), also qualify as "construction" costs. *See* 23 U.S.C. § 121(d) (1964) ; 23 C.F.R. Part 1, Appendix A, § 12 (1970).

36. We find no support in that history for appellees' argument that hearings were precluded because they would take too much time. There was some talk in Congress of the need to move ahead with the project. But it does not follow, as appellees insist it does, that a congressional concern with completing the Bridge *soon* requires that certain time-consuming procedures, such as hearings, be waived, while other equally time-consuming practices also required by Title 23, such as advertising for sealed bids, are to be followed. A statute would have to be much more specific if it is to eliminate certain, but not all, "time-consuming" procedures.

37. *See* H.R.Rep.No.1584, 90th Cong., 2d Sess., 17–19 (1968). The Senate Report, No. 1340, 90th Cong., 2d Sess. (1968), U.S.Code Cong. & Admin.News 1968, p. 3482, sheds no light on § 23 because there was no similar provision in the Senate version of the bill.

38. H.R.Rep.No.1799, 90th Cong., 2d Sess. (1968). The "Statement of the Managers on the Part of the House" was only appended to the Conference Report, U.S. Code Cong. & Admin.News 1968, p. 3531. It did not represent the will of the Senate conferees and can only be said to represent the personal opinions of those who signed it. The chairman of the Senate managers, Senator Randolph, agreed that the specifics in the House Managers' Statement were "dictum" and not the "intent of the Senate." *See* 114 Cong.Rec. (Part 18) 24035 (1968) (remarks of Sen-

We fully recognize that it is not without risk to rely on the remarks of individual members of Congress for legislative history.[39] Nevertheless, we think it noteworthy that we have been able to find no statement during the floor debate by a proponent[40] of Section 23 indicating that any or all provisions of Title 23 were not to be applied in planning and building the Bridge. Indeed, the only discussions of the issue clearly indicate support of our interpretation from those supporting Section 23. For example, Representative Cramer, a leading proponent of Section 23, explicitly stated that the City Council could hold further hearings to determine route locations and de-

signs, within the broad "corridors" established by Congress.[41] Senator Randolph gave his word to the Senate that

Section 317 of Title 23 would be in effect for a specific project mentioned in Section 23(b) of the Act.[42] We also take note of the fact that when the bill was passed the Secretary of Transportation also interpreted Section 23 as we do today.[43] The contemporaneous construction of a statute by one charged with its enforcement is entitled to great weight from this court.[44]

Appellees have urged that it would be futile to hold hearings or to require the Secretary to make the determinations

---

ators Mansfield and Randolph). *See also id.* at 24028 (remarks of Senator Cooper) : "I was amazed when I read the report of the managers to discover what they had written out in their managers' report." But even the House Managers' Statement contains no indication that any of the provisions of Title 23 were to be inapplicable.

39. United States v. Matthews, 136 U.S. App.D.C. 196, 201 n.9, 419 F.2d 1177, 1182 n.9 (1969) : " * * * [T]he isolated remark of one Congressman does not constitute any authority for the proposition that Congress as a whole intended [the particular result]."

40. The statements of proponents are much more likely to portray an accurate representation of Congress' intent than are the views of the opponents. "[W]e have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach. * * * 'It is the sponsors that we look to when the meaning of the statutory words is in doubt.' Schwegmann Bros. v. Calvert Distillers Corp., 341 U.S. 384, 394-395, 71 S.Ct. 745, 95 L.Ed. 1035 * * *." N. L. R. B. v. Fruit & Vegetable Packers & Warehousemen, 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964).

41. *See* 114 Cong.Rec. (Part 15) 19923 (1968) (remarks of Representative Cramer) : "There still can be changes in that route within the traffic corridor. At the same time there can be hearings. * * * [T]he language in the bill does not preclude hearings. As far as I am concerned, let the City Council hold

hearings, let them decide which location within the traffic corridor should be finally approved pursuant to the section of the bill.
* * * * *
"The term 'routes' as used in [§ 23] * * * refers to the traffic corridors * * * and is not intended to prescribe a specific location for any of the interstate highways to be constructed."

42. *See* 114 Cong.Rec. (Part 18) 24033 (1968) (remarks of Senator Randolph).

43. *See* Transcript of News Conference of the Secretary of Transportation, August 24, 1968. *See also* Statement of President Johnson, August 23, 1968, 114 Cong. Rec. (Part 24) 30958-30959 (1968) (Secretary of Transportation to approve projects named in § 23 only when they are "shown to be appropriate links in a comprehensive transportation plan for the District").

The incumbent Secretary has recently recommended further planning on at least one project mentioned in § 23(b). *See* Letter from Secretary of Transportation to Spiro T. Agnew and John W. McCormack, February 22, 1970, Enclosure 4.

44. Udall v. Tallman, 380 U.S. 1, 16-18, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). " 'Particularly is this respect due when the administrative practice at stake "involves a contemporaneous construction of a statute by the men charged with setting its machinery in motion, of making the parts work efficiently and smoothly while they are yet untried and new." ' Power Reactor [Development] Co. v. [International Union of] Electricians, 367 U.S. 396, 408 [81 S.Ct. 1529, 6 L.Ed.2d 924]." *Id.* at 16, 85 S.Ct. at 801.

called for by the statute in light of the finality of the location and design plans which Congress is said to have prescribed for the District. Congress, however, only directed construction of the routes "as set forth" in certain cost estimates. These cost estimates by their own terms did not constitute final route placements.[45] They only located a "corridor" within which roads were proposed.[46] The preface to the cost estimates document carefully explained that the routes were laid out only for the purpose of approximating costs, and that the cost figures there presented were based on the "least costly" of "several feasible alternatives which will serve the function of the designated route." [47] Therefore, we find no indication in the record before us that, as appellees contend, a public hearing or Title 23-required action by the Secretary would serve no useful purpose.

Congress has directed that a bridge be built over the Potomac following the general configurations laid out in the cost estimates. But there are still many variations of bridge design and location (particularly in relation to the placement of the access ramps) which could be adopted and still be consistent with the congressional mandate. Given the forum of a public hearing, citizens may well be able to offer constructive alternatives to the final proposals produced by the District officials, alternatives which more effectively minimize disloca-

tion in the historically important Georgetown area.[48] In like manner, the Secretary, when required to make the determinations called for by Title 23, may well find that other feasible routes, or a tunnel, destroy fewer acres of valuable park land.

Appellees contend that construing the statute as we do to allow flexibility to federal and District officials in formulating the final plans does violence to the "[n]otwithstanding * * *" language of the statute. We disagree. Several years ago a suit was brought by some of the plaintiffs in this action to block construction of the Three Sisters Bridge and other highway projects because the District had not complied with District and federal highway laws governing the planning and construction of the projects. This court, in D. C. Federation of Civil Associations, Inc. v. Airis,[49] held that the District could not construct any future freeways without complying with the relevant provisions of the District of Columbia Code. Our decision did not prevent the District from participating in interstate construction projects. The District government was free to build the freeways simply by holding the required hearings and complying with the other provisions of the law. However, instead of moving forward with the Three Sisters Bridge, the District government apparently decided to abandon the project altogether. The City Council took no further action in relation to

45. In any case we would hesitate to construe § 23 as precluding *any* further planning by local officials in view of Congress' long-standing practice not to make such precise decisions. *See* H.R.Rep.No.1584, 90th Cong., 2d Sess. 53 (1968) (additional views) : A rule of the House Committee on Public Works provides " * * * it shall not be in order for any bill providing for general legislation in relation to roads to contain any provision for any specific road." *See also* S.Rep.No.1965, 84th Cong., 2d Sess. 4 (1955) (interstate system to be locally planned; routes not to be dictated by federal government) ; 23 U.S.C. § 103(d) (1) (Supp. IV 1965–1968) : "The routes of this system, to the greatest extent possible, shall be selected by joint action of the State highway departments of each State and the adjoining States, subject to the approval by the Secretary * * *."

46. *See* remarks of Congressman Cramer, *supra* Note 41.

47. 1968 Estimate of the Cost of Completing the National System of Interstate and Defense Highways in the District of Columbia, Preface (1967).

48. *Cf.* Secretary's letter, *supra* Note 43, recomending further planning and thought about a route mentioned in § 23(b) and detailed in cost estimates.

49. 129 U.S.App.D.C. 125, 391 F.2d 478 (1968).

the Bridge; the National Capital Planning Commission disapproved of the project; and finally the Secretary of Transportation deleted the Bridge from his comprehensive maps of the Interstate System for the District.

Congress reacted to the District government's inaction on highway construction by ordering a bridge to be built "[n]otwithstanding any other provision of law, or any court decision or administrative action to the contrary." [50] There can be little doubt that it was Congress' intent to countermand the District government's "administrative action" which had stopped further interstate construction. But nothing in the statute indicates that Congress intended the Bridge to be built contrary to its own laws. In essence, then, Section 23 amounts to a direction from Congress to the relevant District and federal officials to continue with the bridge and highway plans they had been formulating prior to the *Airis* decision.

We hold that Section 23 requires that both the planning and the building of the Three Sisters Bridge comply with all applicable provisions of Title 23. Since the District Court ruled otherwise, we remand the case to the District Court for an expedited evidentiary hearing to determine whether appellees have in fact complied with the provisions of Title 23.

In aid of the remand we feel it appropriate to comment on the meaning of the hearing requirement of 23 U.S.C. § 128. Of course, it will be for the District Court to determine, after hearing all the evidence, whether the six-year-old hearings alluded to in the papers before us satisfy the requirements of Title 23. However, it should be made clear that the Secretary's regulations [51] implementing Section 128 apply to this Bridge project. The basic requirement is that both a location hearing (held "before the State highway department is committed to a specific proposal") and a design hearing (held "after the route location has been approved, but before the State highway department is committed to a specific design proposal") must be scheduled.[52] The regulations make specific provision for projects like this one on which some hearings have been held before the effective date of the regulations.[53] Since the regulations apply by their terms and since in promulgating the regulations the Secretary made reasonable provisions for those projects which had been the subject of hearings before the effective date of the regulations, we see no reason not to apply these regulations to this case.[54]

---

50. Presumably the "court decision" language refers to our decision in *Airis*, but the reference is mistaken since that decision was not "to the contrary."

51. 23 C.F.R. Part 1, Appendix A (1970).

52. *Id.* at §§ 4(a), 4(b).

53. *Id.* at § 6(d).

54. These regulations apply to all projects which had not received both location and design approval from the Department of Transportation before the effective date of the regulations. Appellees assert that approval of the final location of the Bridge was obtained before that date. The accuracy of that assertion will be for the District Court to determine. However, appellees concede in their briefs that there has been no design hearing on the bridge and that approval of the final design was not obtained before the regulations became effective. The regulations provide in § 6(d) (2) (b):

> If design approval is requested within 3 years after the date of the hearing, compliance with the design hearing requirements is nevertheless required unless the division engineer finds that the hearing adequately dealt with design issues relating to major design features.

It may be that design approval was not requested before the end of the three-year period (*see* 23 C.F.R. Part 1, Appendix A, § 6(d) (2) (a)), or that, as appellees concede, the division engineer has not made the finding required by the regulation quoted above, or that even if the division engineer has made the required finding, the record will not support that finding. In any such case of non-compliance, the Bridge cannot proceed until design hearings which conform to the regulations have been held.

We have discussed the requirements of the hearing regulations with specificity because that issue has been clearly raised by the parties. We do not, however, con-

Reversed and remanded for proceedings consistent with this opinion.

BAZELON, Chief Judge (concurring).

I join in Part II of Judge Wright's opinion. I agree that the planning provisions of Title 23 apply to the Three Sisters Bridge Project, and that the case must be remanded to determine whether there has been compliance. Because that conclusion is compelled in my view by an analysis of the statutory language and the legislative history, I find it unnecessary to reach the constitutional questions, and therefore I express no opinion on the matters discussed in Part I.

The legislative history of the Federal-Aid Highway Act of 1968 reveals a fundamental conflict over the procedures to be followed in commencing work on the Three Sisters Bridge Project. Undoubtedly some legislators thought that a statute ordering immediate construction of the Bridge would eliminate the necessity for at least some preliminary procedures.[1] Others contemplated that the statute would simply reverse the District government's inaction and compel the government to recommence work on the Bridge in compliance with the procedures of Title 23.[2] This conflict produced an ambiguous statute, compelling the court to resolve the disagreement.[3]

The plain language of the statute directs the District of Columbia to construct the Bridge in accordance with all applicable provisions of Title 23, and to commence work on it within 30 days. If the legislators had reached agreement on the suspension of hearings and other planning procedures, they could have expressly suspended particular provisions of Title 23. We cannot read into the reference to "applicable" provisions of Title 23 a suspension of particular provisions as inapplicable, without explicit criteria for the distinction in the language of the statute itself. The Statement of the House Managers is of course entitled to respect in determining the legislative intent.[4] It cannot, however, supply the specificity necessary to make fine distinctions since no basis for those distinctions can be found in the language chosen by the legislative conferees.

Our construction of Section 23 of the Highway Act is the one adopted by the Secretary of Transportation at the time the statute was enacted. The Secretary's interpretation may well have been based in part on the failure of Congress to distinguish between applicable and inapplicable provisions with the specificity necessary for effective administration.

Finally, our interpretation is further fortified by the fact that it avoids treating District residents less favorably than all other citizens with respect to the federal highway system. The court has no occasion to consider at this time the impact of any particular Bridge location or design on the public interest. It is precisely these issues which appellants seek to ventilate. Apart from constitutional considerations, we should not lightly presume that Congress has deprived District residents of an opportunity afforded to all other citizens, at least in the absence of the clearest legislative mandate, which is lacking here.

fine the scope of the remand hearing to the question of compliance with those regulations. If the District Court finds that appellees have not complied with any provision of Title 23 (including the regulations contained in 23 C.F.R. Part 1, Appendix A), the District Court should enjoin further action on the Bridge project until appellees have complied with all such provisions.

1. See, e. g., Statement of the Managers on the Part of the House, H.R.Rep.No.1799, 90th Cong., 2d Sess. (1968).

2. See, e. g., 114 Cong.Rec. (Part 18) 24033 (1968) (remarks of Senator Randolph).

3. Compare, e. g., Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (April 6, 1970) (Harlan, J.).

4. It is not, however, entitled to the weight of a conference report, since it was not signed by a majority of the Senate conferees. See 79 Cong.Rec. 12237–39 (1935) (ruling by the Speaker of the House).

MacKINNON, Circuit Judge (dissenting):

The panel opinion, with which I cannot agree, holds in effect that Congress did not intend to direct that the Three Sisters Bridge be built until there were further hearings. It arrives at this conclusion by refusing to consider some of the most reliable indicia of legislative intent and while it asserts reliance upon the "authoritative legislative history," it only does so to a limited extent. Consideration of *all* the legislative history including the most important Statement of the House Managers in my opinion indicates that Congress clearly directed that the Three Sisters Bridge be built immediately and I do not find that such direction was improper or invalid.

I

In interpreting any statute the language of the act itself is the most important element. Next come the written reports of the Committees and Conference Managers. Here we are concerned with section 23 of the Federal Aid Highway Act of 1968, which is previously quoted in the panel opinion. This section was drafted in the congressional Conference Committee. The bill originated in the Senate but it contained no provision on highways for the District of Columbia. When the bill reached the House of Representatives it was amended to require "the construction, as soon as possible, of *all routes* in the interstate system within the District of Columbia as set forth in" the 1968 Estimate of the Cost of Completion of the National System of Interstate and Defense Highways in the District of Columbia.[1] The House of Representatives was thus the moving force with respect to the District of Columbia highway program in this bill. With the bill in this posture it was referred to a Conference Committee to consider the disagreements between the two houses including the difference on the District of Columbia highway program. In Conference, the Managers for both houses agreed upon the language contained in section 23[2] which we are interpreting in this case. It reduced somewhat the projects that were directed to proceed immediately.

The panel opinion seeks some support for its construction of section 23 from the Senate debates and attempts to make a point of the fact that only the statement of the Managers on the part of the House was appended to the Conference Report. In this way it attempts to work around the Statement of the Managers on the part of the House. It is necessary for the panel opinion to evade a confrontation with this vital document, because the decision it announces cannot be squared with the Statement of the Managers for the House where the bill originated. In thus seeking some legislative backing for its construction of section 23, it refers to the remarks of Senator Cooper,[3] but it is significant that Senator Cooper was substantially in the minority on this matter; and on the final passage of the bill in the Senate his views were rejected by the entire Senate and the bill was passed 66 to 6. Senator Cooper was one of the six who voted against the bill. It is elementary that legislative intent is not reflected by floor speeches of Senators having that relationship to a bill and to the Senate's vote thereon. It is also obvious that in such circumstances, when one tries to work

1. Congress frequently legislates in this manner by referring to official reports or documents within the cognizance of the committee or Congress.

2. Section 23 in the final bill was altered over section 23 as originally adopted by the House of Representatives. Generally the final draft reduced the number of projects upon which immediate work was directed and provided additionally that a number of other D. C. highway projects, in varying stages of readiness, be studied and reported on within 18 months.

3. Senator Cooper was a member of the Committee on Public Works, was a member of the Conference Committee, but refused to sign the Conference Report. His views are obviously not the views of the Senate Committee or the Senate, which recommended, adopted and passed the Conference Report and bill.

around the Statement of the Managers who drafted the section and replace their views with those of one Senator who opposed the section, voted against the bill and whose views on this and other portions of the bill were voted down 66 to 6, that you hardly come up with a reliable interpretation of the section. The views of the minority of a house do not indicate the intent of the majority and the panel opinion cannot make them do so.

The Senate rules do not provide for the Managers on the part of the Senate to file statements of their views as a part of Conference Committee Reports. The House Rules do provide for their Managers filing Reports.[4] It is thus of no significance that the Senate Conferees on this highway bill did not file a statement.

In this case since section 23 of the bill largely originated in the House the Statement of the House Managers is all-important. They were the proponents of section 23 and it was agreed to along with the rest of the bill by the overwhelming majority of the Senate. At this point it is conducive to an understanding of the Senate action to refer to the significant remarks of Senator Randolph of West Virginia, the Chairman of the Senate Committee on Public Works that handled the bill. His remarks appear in the Congressional Record for July 29, 1968 at page 24030 [5] as follows:

One of the most difficult issues before the conference was that involving the District of Columbia interstate highway program. The language of the House bill required immediate construction of those highways in the District of Columbia as contained in the 1968 cost estimate. The Senate bill had no comparable language.

The Senate conferees approached this matter with reluctance and reservation. We did not believe that this was a matter that should be handled in a national highway act. However, in the interest of comity and with the desire to bring a bill out of conference, we proposed certain changes in the House language and in the give-and-take which ensued, the language of section 23 of the conference report was developed.

Under the terms of this section, the District of Columbia government and the Secretary of Transportation are directed to proceed with four projects: The completion of the center leg to New York Avenue; the *construction* of the east leg; the Potomac River Freeway, and the Three Sisters Bridge. It is our belief that three of these four projects are relatively noncontroversial and can be accomplished with a minimum of disruption and dislocation to the citizens of the District of Columbia.

The fourth project, the Three Sisters Bridge, is a matter of controversy, but it is also vital to the development of proper access to Dulles International Airport and the question of the bridge had to be answered if the State of Virginia is to be able to proceed with its development and construction of Interstate Route 66. Those who took part in the conference agreed that the Three Sisters Bridge is to be built in such a way that it will not now or in the future result in any encroachment on Glover-Archibold Park. This is a matter on which we all agree and we insist that everything be done to protect that area of the District of Columbia from any kind of highway construction. *With this understanding a majority of the Senate conferees agreed to this part of the District of*

---

4. Rules of the House of Representatives of the U.S., 90th Cong. (1967), Lewis Deschler, Parliamentarian. Rule XXVIII, Conference Reports § 911:
   1. (c) And there shall accompany every such report a detailed statement sufficiently explicit to inform the House what effect such amendments or propo-

sitions will have upon the measures to which they relate.

5. Subsequent references to Senate debates refer to the Congressional Record for this date. Vol. 114, Cong.Rec., Part 18, p. 24030, July 29, 1968.

*Columbia highway program.* (Emphasis added.)

These remarks speak for themselves and indicate agreement with section 23. His statement that a majority of the Senate conferees have agreed to *"construction"* of the Three Sisters part of the District of Columbia highway program is most significant.

To obtain an accurate interpretation of the law as it was finally drafted it is also necessary to correct several other inaccuracies that appear in the panel opinion with respect to the Senate and House debates.

Further as to Senator Randolph, regardless as to how the panel opinion seeks to characterize the attitude of the Senate and Senator Randolph upon the statement of the House Managers on the Three Sisters Bridge, the fact is that Senator Randolph adopted the last paragraph of it (by reading it to the Senate) which refers to relinquishing the right of way through Glover Archibold Park in support of his statement that "we are not allowing it [building of a freeway through the park]." Cong.Rec. p. 24035. In so doing he also read the sentence which reads:

"The *design of the bridge* does not require intrusion on the park * *."
(Emphasis added.)

Does this sound as though the "design of the bridge" was still an open question? Obviously, it was not and Senator Randolph so recognized.

The panel opinion in footnote 38 also seeks to make some use of a comment on the Senate floor that the specifics in the statement of the House Managers were "dictum" and not "the intent of the Senate." (Cong.Rec. 24035). However these remarks (Cong.Rec. 24035) were directed at the "Notwithstanding" direction of the *bill* which was allegedly carried out by the Glover Archibold provision in the statement of the House Managers.[6] I do not read the remarks of

Senator Randolph as stultifying section 23 of the bill as enacted, and obviously Senators and Representatives by their individual remarks on the floor cannot authoritatively speak for the "intent" of either body contrary to the provisions that Congress enacts. What is important is not the intent of individual Senators, or even the intent of the House or Senate, but the intent of *Congress* as evidenced by the bill and the entire legislative history where that needs to be referred to. It is the intent of Congress that prevails. Statements of individual members of Congress cannot alter what Congress enacts.

No disclaimers by individual Senators or Representatives can effect what the two houses did collectively by adopting the bill *with* the D. C. highway provisions.

Senator Tydings also noted immediately following final approval of the bill that it requires the District Government to proceed with " * * * the *construction* of * * * the Three Sisters Bridge." (Emphasis added.) (Cong.Rec. 24038).

Further, Senator Jackson stated he *understood* "the *freeway* would go under the existing C. & O. Canal." (114 Cong. Rec., Part 18, p. 24033) Such understanding is consistent with interpreting the legislation as recognizing that there was no question as to the *location* of that project. He was also assured by Senator Randolph that the bill would not take away from the Secretary of the Interior "an opportunity to go over the final design" of the *Potomac River Freeway* (which involved the freeway going under the C. & O. Canal). The panel opinion attempts to turn this to support additional design hearings and approval with respect to the *Three Sisters Bridge*, but it cannot be so twisted. The Potomac River Freeway project and the Three Sisters Bridge project are different projects and in different stages of planning. As the statement of the House Managers states with respect to the Potomac River Free-

6. Appellants here are not at war with the direction in the statement of the House Managers that "no intrusion of" Glover Archibold Park take place. In fact, they insist upon it being carried out.

**452**

way and to which Senator Jackson referred (Cong.Rec. 24033):

> "The District of Columbia Department of Highways shall immediately upon enactment of this legislation *proceed to design this entire facility* \* \* \*." (Emphasis added.)

With the Potomac River Freeway Project in that stage of development it is perfectly obvious that subsequent *design* provisions of Title 23 might be applicable (according to their tenor) but that is no basis for saying that the same thing is true of the Three Sisters Bridge which had an approved design and which was considered as a separate project, not part of the Potomac River Freeway Project, and which was in a more advanced stage of planning and approvals—as the statement of the House Managers stated at page 34 of the Report. Neither Senator Jackson nor Senator Randolph in this colloquy were talking about the Three Sisters Bridge and their remarks cannot be twisted to that end. Moreover, Senator Randolph did not give his word that Title 23 "would be in effect for specific projects mentioned in Section 23(b) of the Act." See pp. 19–20 of panel opinion. His remarks were directed *solely* to Senator Jackson's inquiry as to *the Potomac River Freeway* and the power of the Secretary of Interior thereto. To the extent that the panel opinion seeks to convey the impression that Senator Randolph represented that *all* provisions of Title 23 would be applicable to *all* the projects mentioned in section 23(b), the opinion is incorrect. It also flies into the face of the specific provision of section 23 that only the *"applicable* provisions of Title 23" would apply.

The panel opinion quotes Senator Cooper as being "amazed" at the House statement. This remark is of no significance here. His objection was to legislating on the District of Columbia highways in a national highway act, to directing the District of Columbia and the Department of Transportation in connection with "the *construction"* of the D. C. roads, and to laying down "directions almost like a construction company, how to proceed with the construction." Cong.Rec. Vol. 114, part 18, pp. 24028, 24035. He never said or inferred that the statement of the House Managers was *incorrect* in any respect but only that it was too specific and out of place in a national highway act. His objection also went to the specific directions in the *bill* as to the D. C. highway program.[7] None of this furnishes any basis to challenge the *correctness* of the statement of the House Managers. Senator Cooper was also in some error about the entire D.C. highway project and he was corrected by Senator Randolph (Cong.Rec. 24034–24035). To summarize, Senator Cooper was opposed to the bill. He was opposed to the Senate's position on the bill. His views on the bill accordingly have no persuasive weight in interpreting the bill.

Floor remarks of Congressman Cramer are also misinterpreted by the panel opinion (Cong.Rec., Part. 15, p. 19923). In the House debates on the bill, Congressman Cramer said in effect that the D.C. City Council could still hold hearings as to location within the corridors of the *interstate highways* to be constructed. His remarks were directed generally to the House bill *at that time* which directed that "all routes" of the Interstate Highway System in the District be constructed —not just the four projects now contained in section 23.[8] His remarks were directed primarily at the highways. The question he was answering was a general question on highways and not a specific question on the Three Sisters Bridge. To illustrate, he was certainly not indicating that there could be hearings on the unfinished portion of the Center Leg that is under construction. His remarks were not directed to section 23 as it passed nor to the statement of the House Managers of which he was one. Neither the

---

7. Senator Cooper also refused to sign the Conference Report as one of the Managers on the part of the Senate.

8. It also directed immediate construction of all the highway projects now placed by section 23 in the 18-month study and report.

statement of the House Managers nor section 23 as it presently exists had then been drafted. His remarks are thus not applicable to section 23 as it now exists, though they could be construed to have a general application to it.

But even more significant than these views of a few Senators and Congressmen is the statement of the Managers on the part of the House with respect to the Three Sisters Bridge. This is the document that the panel opinion seeks to ignore. *It never refers to its provisions.* True legislative intent cannot be determined ·by consideration of only a part of the legislative history any more than it could by considering only a part of the bill. The statement of the House Managers (hereafter the statement) is contained in the Conference Report to accompany S. 3418, House of Representatives, 90th Cong., 2d Sess., Report No. 1799, p. 34. The portion thereof dealing first with the Three Sisters Bridge reads as follows:

> The House amendment contained a provision requiring that all routes on the Interstate System in the District of Columbia set forth in "The 1968 Interstate System Cost Estimate," House Document 199, 90th Congress, be constructed as soon as possible.

> The Senate bill contained no comparable provision.

> The proposed conference substitute requires that, notwithstanding any other provision of law, or any court decision or administrative action to the contrary, the Secretary of Transportation and the government of the District of Columbia shall, in addition to those routes already under construction, not later than 30 days after enactment, commence work on the following projects:

> 1. *Three Sisters Bridge, I–266*

> In early 1966 an agreement was reached among all affected parties as to the location of the Three Sisters Bridge. Consultant engineers have completed a type-size-and-location report on the bridge.

The specific design for the bridge was approved by the Fine Arts Commission on September 20, 1967. In writing to the Department of Highways and Traffic granting its approval, Mr. William Walton, Chairman of the Fine Arts Commission, stated in part: "We felt your designer had performed brilliantly in creating a design for one of the most important scenic sites around the Capital. Its simplicity and its daring both are very commendable characteristics."

The decision of the Fine Arts Commission in this respect safeguards the aesthetic values of concern to so many and preserves the beauty and recreational characteristics of the Potomac River. The design approved by the Fine Arts Commission shall be carried out precisely as approved with respect to materials and architecture.

The National Capital Planning Commission approved the general alignment of the bridge on September 15, 1966, and the geometrics on May 2, 1967, subject to certain reviews by the Department of Transportation. The Department of Transportation by letter to the National Capital Planning Commission in February of 1968 returned the decision to local prerogatives. The bridge location and geometrics shall therefore proceed as presented to the National Capital Planning Commission in September of 1966 and May of 1967 with no further actions required by that or any other body.

With respect to the scheduling of construction, the Congress directs that the first substructure contracts be advertised for construction within 90 days of the enactment of this legislation.

Immediately upon completion of construction of the bridge, the District of Columbia shall relinquish to the National Park Service the right-of-way through Glover Archbold Park that it presently holds. The design of the bridge does not require intrusion on the park and the Congress directs that no intrusion of the park take place.

U.S.Code Cong. & Admin.News 1968, p. 3540.

If the panel opinion had also considered this language they would have noted the direction that construction of the Three Sisters Bridge begin with no further action required by the National Capital Planning Commission or any other body.

The next provision of the statement is also very significant. It states:

"* * * the Congress directs that the first substructure contracts be advertised for construction within 90 days of the enactment of this legislation."

A mere reading of this directive makes it obvious that they were not in the same breath ordering that extensive hearings be held on location and design. Hearings on location and design were pre-construction requirement preliminaries which had already been satisfied as the statement observed. The statement also states that

In early 1966 an agreement was reached among all affected parties as to the *location* of the Three Sisters Bridge. Consultant engineers have completed a type-size-and-*location* report on the bridge. (Emphasis added.)

It next states:

The specific *design* for the bridge was approved by the Fine Arts Commission on September 20, 1967. (Emphasis added.)

Does this sound as though they were directing that additional hearings be held on location and design? Obviously not. To suggest that the Conference Report in one breath directed:

Such construction shall be undertaken as soon as possible after the date of the enactment of this Act. * * * Not later than 30 days after the date of enactment of this section the government of the District of Columbia shall commence work on the following projects:

(1) Three Sisters Bridge, I–266 (Sections B1 to B2).

* * * * * *

(and from the Statement, all such shall be) * * * with no further action required by that or any other body. * * * [T]he Congress directs that the first substructure contracts be advertised *for construction* within 90 days of the enactment of this legislation. (Emphasis added).

and in the same breath directed that *new hearings* be begun on location and design, is to suggest that Congress directed an absurdity.

So it is perfectly obvious when the statement of the House Managers is read, as it must be read to truly determine the intention of Congress, that the bill clearly directs the construction of the Three Sisters Bridge with no further action required by the National Capital Planning Commission or any other body.

Some of the confusion in the panel opinion also results in my opinion from its inability to fathom section 23 which provides in part:

Such construction shall be undertaken as soon as possible after the date of enactment of this act except as otherwise provided in this section and shall be carried out in accordance with all *applicable* provisions of Title 23 of the United States Code. (Emphasis added.)

In trying to interpret this provision the panel opinion obtains some false comfort from the negative fact that they were unable to find any statement during the congressional floor debates indicating that any or all of the provisions of Title 23 were not to be applied in the planning and building of the bridge. The panel's difficulty in this respect stems from the fact that it attempts to give a wooden interpretation to section 23.

This results from its failure to come to grips with the statement. Had they done so they would have noted that the Congress intended the Title 23 provision of section 23 to be given a *flexible* application to the four projects (and the 18 months projects) depending upon the extent to which each of the projects had

progressed when the act was passed. Having failed to consider the statement of the House Managers the panel opinion thus was apparently not aware of the full import of the Title 23 provision and how it would *necessarily* apply differently to each project.

The Title 23 provision in the law was not only applicable to the Three Sisters Bridge but it was also applicable to three other projects (and to the 18 month projects). And if the panel opinion had considered the statement with respect to all the projects it would have noted that each project was in a different stage with reference to being ready for construction and that Congress was not directing the same action with respect to each project:

1. With respect to the *Three Sisters Bridge* they were directing work within 30 days and "that the first substructure contracts be advertised for construction within 90 days of the enactment of this legislation."

2. With respect to the *Potomac River Freeway* the direction of Congress was that "The District of Columbia Department of Highways shall immediately upon enactment of this legislation *proceed to design* this entire facility by use of consultants or otherwise, to begin no later than 60 days from the enactment of this legislation. Construction shall commence in a logical sequence as soon as designs have been prepared."

3. With respect to the *Center Leg of the Interloop* the direction in the Conference Report emanating from the Managers on the part of the House stated:

The center leg is *already under construction,* in various stages. It shall be completed to New York Avenue, where it will terminate until plans are completed for its continuation and connection with other parts of the system to be approved at a later date.

4. With respect to the *East Leg of the Interloop*, the direction in the report was more varied. Following are some of the excerpts:

Interchange C is in various stages of design and construction from Sixth Street SE., to and including Barney Circle. It is the essential connecting link to the east leg of the inner loop, and its construction shall proceed under the current schedule until completion.

The east leg of the inner loop, extending from Barney Circle to Bladensburg Road as a part of Interstate Route I-295, shall proceed immediately as described herein.

\* \* \* \* \* \*

The design of the terminus at Bladensburg Road will take into account the possibility of extension of this project as a tunnel under Mount Olivet Road.

A design consultant has already proceeded with much of the design between Barney Circle and Benning Road. The District shall direct him to resume work, with the first construction contract to be advertised within 90 days of enactment of this legislation.

With respect to the portion from Benning Road to Bladensburg Road, the District of Columbia shall immediately upon enactment of this legislation commence negotiations for a design contract, said contract to start within 60 days of enactment of this legislation. Construction on this part of the project shall commence as soon as plans have been prepared. The alignment for this portion of the route shall be as presented at a public hearing in January of 1967 and subsequently approved by the National Capital Planning Commission on February 9, 1967, and the District of Columbia Board of Commissioners on March 9, 1967.

The plan here described already has the approval of all the agencies concerned, including the Park Service, the National Capital Planning Commission, and to the extent required, the Fine Arts Commission. \* \* \*

\* \* \* \* \* \*

With respect to those parts of the Interstate System included in the 1968 cost estimate and not specifically dealt

with above, the government of the District of Columbia and the Secretary of Transportation are directed to study those projects and report to the Congress within 18 months from the date of enactment their recommendations with respect to such projects, including any recommended alternative routes or plans, so that the remainder of the Interstate System within the District of Columbia may be appropriately authorized.

From the foregoing it is apparent that each of these four projects were in different stages:

The Three Sisters Bridge had already been approved as to location and design.

The Potomac River Freeway had to proceed into the final design stage and to the right of way acquisition. The direction was to proceed to design this entire facility with construction to commence in a logical sequence as soon as designs have been prepared.

The Center Leg is already "under construction."

The East Leg still had some design problems. And the 18 months projects were an entirely different matter.

Now it is perfectly obvious from this factual situation that nobody in Congress was going to designate what provision of Title 23 did not apply to any particular project because *all provisions applied to some of the projects.*

So Congress met the problem by stating in the Title 23 section that only the "applicable provisions of title 23" would apply.[9] If Congress had intended all provisions to Title 23 to apply they would

have said the projects were to "be carried out in accordance with * * * title 23" and thus have deleted *"all applicable provisions of."* But by including the "all applicable provisions" phrase they have indicated that some provisions are *not* to be "applicable."[10] This is a perfectly reasonable standard and the provisions that are not to be applicable are the provisions of Title 23 that do not apply in "logical sequence" to the individual projects because of the progress such projects had already made in planning, designing, approving, locating and contracting (constructing). In other words, I would not interpret Congress' action as directing that the project be backed up and that steps be taken that had already been satisfied and which the Statement found had already been taken.[11] If such a flexible interpretation of the Title 23 provision is to be supplanted by a rigid interpretation that applies *all* the provisions of Title 23 to *all* the D. C. projects (as the panel opinion seeks), additional hearings could also be required on the *unfinished portions* of the Center Leg. This is one of the four projects referred to in section 23 and it is "under construction." Such would be an absurdity and hence the rigid application of *all* Title 23 provisions to *all* the projects must be rejected as unreasonable and obviously not intended.

It is likewise absurd to construe the Title 23 provision as indicating that Congress was directing location and design hearings on the Three Sisters Bridge since the "location" had been agreed to and the design had been approved. The panel opinion disregards the rule of reason in this legislation and overlooks the

9. Legislative bodies frequently provide that a statute designed for one purpose apply *mutatis mutandis* to another purpose.

10. This is the provision the panel opinion says does not exist.

11. The concurring opinion, by conclusory statements unsupported by factual analysis, fails to find in the statement of the House Managers the "specificity" it considered necessary to establish the standard to be applied in determining which

provisions of title 23 Congress intended to be not "applicable." However, the provision of the *law* directing "work" to begin within 30 days furnishes all the "specificity" any person needs to see that Congress clearly did not intend *all* the provisions of section 23 to be applied *ex post facto.* The 30-day provision also is sufficient indication of a congressional intent that regulations promulgated *five months after* passage of the law were *not* to be considered as being within the "applicable" provisions of title 23.

use of the word "applicable" in the congressional direction contained in the Title 23 provision.

The fact that Congress indicated that construction should comply with the *applicable* provisions indicated that there might be some provisions that were not applicable and I submit that the obvious conclusion from all the facts, the legislative history and the background, is that the direction to construct the Three Sisters Bridge "with no further action required by that or any other body" and the direction the the first substructure contracts be advertised for construction within 90 days of the enactment of the legislation is a clear indication that Congress was not directing that hearings be held on location and design of the Three Sisters Bridge.

The location and design provisions of Title 23 could well have some application to some of the other projects but they obviously were not intended to have any effect on the project that is already under construction (that is the Center Leg of the Interloop). And once it is recognized that the section 23 has to yield to such an interpretation with respect to the project that is "under construction" because only "applicable" provisions can apply and that it would not be a reasonable construction to require *duplication* of work, then *a fortiori*, the location and design provisions of Title 23 would not be applicable to the Three Sisters Bridge because its *location* and *design* had already been approved under procedures in effect at the time these features came up in logical sequence.

So it must be concluded, that the statement of the House Managers does not conflict with any provision of section 23, and in fact fills in the blanks of misunderstanding and misinterpretation that exist in the panel opinion. This is the usual function of such a statement which is one of the most reliable indices to legislative intent that exists in our national Congress. The House statement here is particularly important because section 23 originated in the House and it was the House Conferees that were pressing it.

A person who drafts a particular provision is usually a reliable source as to what was intended by the language used.

II

The action directed by section 23 is well within the powers of Congress in dealing with the District of Columbia. District of Columbia v. John R. Thompson Co., 346 U.S. 100, 108, 73 S.Ct. 1007, 1011–1012, 97 L.Ed. 1480 (1953):

The power of Congress over the District of Columbia relates not only to "national power" but to "all the powers of legislation which may be exercised by a state in dealing with its affairs".

To the same effect is Atlantic Cleaners & Dyers v. United States, 286 U.S. 427, 434, 52 S.Ct. 607, 76 L.Ed. 1204 (1932). Congress actually has power to legislate with respect to the District of Columbia in practically the same manner that a city council legislates with respect to the streets and alleys of a city. And it frequently does so. For example, see Chapter 502, Act of August 9, 1935, relating to the Union Railroad Station in the District of Columbia. 49 Stat. 568. *See also* Chapter 354, Act of May 29, 1930 (46 Stat. 482) for the acquisition, establishment and development of the George Washington Memorial Parkway along the Potomac from Mt. Vernon and Fort Washington to the Great Falls for an example of congressional legislation dealing with local public highways.

III

For the time being I pass over any questions under those sections of Title 23 that were in effect when the *Airis* action was brought in 1966. Only one action existed at that time for alleged failure to comply with applicable statutes. Each separate statute does not create a separate cause of action. Plaintiffs here, who must be considered the same as in *Airis*, cannot split their cause of action and now bring a second action on grounds they failed to include in *Airis*. Bienville Water Supply Co. v. City of Mobile, 186 U.S. 212, 216, 22 S.Ct. 820, 46 L.Ed. 1132

(1902); United States v. California and Ore. Land Co., 192 U.S. 355, 358, 24 S.Ct. 266, 48 L.Ed. 476 (1904); Baltimore S. S. Co. v. Phillips, 274 U.S. 316, 319–320, 47 S.Ct 600, 71 L.Ed. 1069 (1927); Hatchitt v. United States, 158 F.2d 754, 756 (9th Cir. 1946). The bar is not absolute, but a strong public policy exists against vexatious and multiple actions and the court would do well to ignore plaintiff's alleged grounds for relief to the extent that they existed in November 1966 when *Airis* was filed.

There are strong reasons here to invoke this rule because the panel opinion in its decision, for the second time, is frustrating a congressional directive. Following this court's first decision in *Airis*, Congress enacted section 23 to supply the congressional directive to the projects that the court had found to be absent in the first case. So to permit the same plaintiffs, with the court's concurrence, to obstruct the second congressional directive on grounds they failed to allege in their first action, and to do so under the guise of carrying out the intent of Congress,[12] is not a result that commends itself to sound judicial administration.

This however brings us to § 128 which was amended in 1968 so as to provide that

Any State highway department which submits plans for a Federal-aid highway project * * * shall certify to the Secretary [of Transportation] that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic *and social* effects of such a location, *its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community.* * * * Pub.L. 90–495, § 24, August 23, 1968, 82 Stat. 828. (Matter in italics was added by 1968 amendment.)

With respect to compliance with section 128 the Deputy Director of Public Records, Federal Highway Administration, Department of Transportation, Edgar H. Swick, by affidavit of October 16, 1969 which is substantially uncontroverted swears:

Title 23, U.S.C. § 128 was complied with, public hearings held on the subject project on November 22, 1961 and November 24, 1964 and the District of Columbia requested approval of the project on September 21, 1966, within three years of the hearings.

The affidavit also states that prior submissions to the Federal Highway Administration by the District of Columbia government and the Metropolitan Washington Council of Governments had certified and demonstrated that "the social, economic and environmental effects of the bridge project and its consistency with goals and objectives of urban planning promulgated by the community were fully *considered.*" This indicates that section 128 as it presently exists has been substantially complied with. Obviously it does not mean that *new* hearings have been held. A mere reading indicates that *new hearings are not required by the amended section.* The amendments of 1968 only required certification that certain local and environmental factors had been "considered." So no question exists as to proper compliance with section 128. It is also significant that appellants' affidavit on the hearing question does not deny that on November 24, 1964 certain hearings were held by the Commissioners of the District of Columbia with respect to the Three Sisters Bridge project.[13] In D. C. Federation of Civic Associations, Inc. v. Airis, 129 U.S.App.D.C. 125, 127, 391 F.2d 478, 480 (1968), at note 8, the court also indicates that a hearing in which specific evidence was introduced was also conducted by the Department of Highways and Traffic of the District of Columbia, citing a story in the WASHINGTON STAR appearing on February 4, 1965, section A, page 1. With the record in

---

12. Arrived at by refusing to consider a substantial part of the legislative record.

13. Affidavit of Robert M. Kennan, Jr. of October 17, 1969.

this state there is no basis for sending the case back for section 128 compliance hearings. Full compliance shows from the record.

## IV

Provisions dealing with the preservation of parklands were added to Title 23 (Highways) by congressional amendments in 1966 and 1968. These provided that after the effective date of the Federal-Aid Highway Act of 1968, the Secretary of Transportation shall not approve any program or project which requires the use of certain publicly owned lands, such as park land, historic sites, etc., except after compliance with certain prescribed standards. With respect to these provisions of section 138 the Swick affidavit indicates compliance with the statute by the Secretary of Transportation when he approved the Three Sisters Bridge project on August 12, 1969 [14] and determined at that time that there was no prudent or feasible alternative to the use of park land, recreation areas and historic areas and that all possible planning was performed to minimize harm to these areas. In doing so the prescribed standards were complied with and the memorandum of the Secretary of Transportation recites the facts with respect thereto. This disposes of this portion of appellants' complaint.

## V

The Swick affidavit thus indicates that sections 128 and 138 have been complied with. If we were to consider the other principal claims of appellants which are rejected as barred because they could have been alleged in 1966, they are also answered by the Swick affidavit as follows:

Title 23 U.S.C. § 103 was complied with (for the second time after prior approval had been rescinded) when the District of Columbia City Council voted on August 9, 1969 to comply with section 23. Appellants in an affidavit ad-

mit this but seek to lessen the effect of this action. However, the Council action does put the project in compliance with section 103.

Under Title 23 U.S.C. § 134 it was determined that the Three Sisters Bridge project was based on a continuous comprehensive transportation planning process carried on cooperatively by the District of Columbia, Virginia, Maryland and the various local communities with the objective of developing long range highway plans and coordinated programs for improvement in other forms of transportation. The Metropolitan Washington Council of Governments approved the project by letter dated December 29, 1967.

Under Title 23 U.S.C. § 317, the Department of the Interior was fully informed of the use of park land for the bridge project and concurred in its use in the District of Columbia. The land on the Virginia side on August 25, 1969 was subject to a final agreement on certain matters.

In all three of these sections of Title 23 present compliance occurred subsequent to November 1966, though the City Council had previously approved and then rescinded.

## VI

What then of the location and design hearings that the panel opinion directs? The decision in this respect flies into the face of the act which directs the government of the District of Columbia to commence *work* on the Three Sisters Bridge "not later than 30 days after the date of enactment of" section 23 and the direction in the statement that "the Congress directs that the first substructure contracts [for the Three Sisters Bridge] be advertised *for construction* within 90 days of the enactment of" section 23.

The holding of the panel opinion in this respect directs hearings on *location* and

14. Swick affidavit of October 16, 1969. *And see* Memorandum of October 15, 1969 of the Secretary of Transportation reciting basis of August 12, 1969 approval, Exhibit F to Swick affidavit.

*design* under a Policy and Procedure Memorandum that was not even promulgated until January 17, 1969 (34 F.R. 727 *et seq.*) some *five months after* Congress passed the law directing that work *begin* on the Three Sisters Bridge within 30 days and that within 90 days "substructure contracts be advertised for construction." [15] How could construction bids for a bridge be advertised if the preliminary requirements of location and design had not been determined? Is it not plain that Congress would not direct public hearings to be held that could change the location and design of a construction project they were directing be advertised for building bids?

It is true that the regulation does make provision for situations "with respect to a project on which a hearing was held * * * before the effective date of this PPM" but a reading of the PPM [16] indicates that it only relates to situations where a *hearing* was held prior to the effective date of the PPM and *no approval* of location or design was received thereafter. It does not apply to projects upon which a hearing was held [17] and approvals received in accordance with prior practices before the effective date of the PPM which was January 17, 1969. The PPM by its terms thus does not apply to the situation involving the approvals of location and design for the Three

Sisters Bridge and the case should not be remanded for any hearing thereon.

To the extent that the panel opinion directs such hearings it creates a monstrous result and completely frustrates the expressed will of Congress. It arrives at that result by an incomplete consideration of the legislative history and an incorrect interpretation of floor statements. The net result is completely without any basis in the record and unjustified.

## VII

What then is the meaning with respect to the Three Sisters Bridge of that provision in section 23 that directs

> Such *construction* shall be undertaken as soon as possible after the date of enactment of this Act, except as otherwise provided in this section, and shall be carried out in accordance with all applicable provisions of Title 23 of the United States Code.
>
> (b) Not later than 30 days after the date of enactment of this section the government of the District of Columbia shall commence work on the following projects:
>
> (1) Three Sisters Bridge, I-266 (Section B1 to B2).
>
> * * * * * *

When everything is considered it seems clear that Congress was directing compliance with those provisions of title 23

---

15. From the statement of the House Managers.

16. d. With respect to a project on which a hearing was held, or an opportunity for a hearing afforded, before the effective date of this PPM, the following requirements apply:

 (1) With respect to projects which have not received location approval:

 * * * * *

 (2) With respect to those projects which have not received design approval:

 * * * * *

 Policy and Procedure Memorandum, Bureau of Public Roads, Department of Transportation, 34 F.R.No.12, p. 729, January 17, 1969.

17. The hearing requirement could not be construed as referring to prior separate hearings on design, because they were not required, but only to such hearings as were provided for. In these, design might be one matter discussed in a general hearing. But the PPM provision on requests for design approval within three years, quoted in the panel opinion in footnote 54, has no application because by the forepart of the regulation it only relates to "those projects which have *not* received design approval." The Three Sisters Bridge is not in this category because its design had been approved by the Fine Arts Commission on September 20, 1967 (Swick affidavit) and there is no indication in the PPM that prior approvals are to be reconsidered or reheard.

"applicable" to the "construction" [18] of the Three Sisters Bridge. This would bring into play those provisions of title 23 relating to apportionment of appropriations (section 104), letting of contracts (section 112), prevailing wages (section 113), supervision of construction (section 114), availability of apportioned sums (section 116), federal share payable (section 120), payments to states for construction (section 121), relocation of utilities (section 123), advances to states (section 124), railway-highway crossings (section 130), equal employment opportunity (section 140), small business participation (section 304), etc.

Such interpretation of the sentence would be reasonable and would not attribute to Congress an intention to require duplication of prior planning that had already been completed with respect to the Three Sisters Bridge when Congress enacted section 23. With respect to projects which were not as far advanced as the Three Sisters Bridge, they would have to comply with requirements they had not fulfilled before the amended requirements became effective. I would thus attribute to Congress the reasonable intention of not requiring duplication of work already completed according to then existing standards. This is the real intention that Congress meant to convey when it used the words "applicable provisions of Title 23" other than directing full "compliance with Title 23."

### VIII

As for the claim that plaintiffs are a "voiceless minority" in the District of Columbia who are being made the subject of invidious discrimination, it should be recognized that plaintiffs here and their lawyers are actually some of the most articulate and politically powerful individuals in America. Their success in obstructing this project now for onto four years is mute testimony that they are not "voiceless." Actually, it is commonly recognized that their close proximity to the seat of Government, the influence of a favorable local press that articulates their position and the frequency with which members of Congress, long resident in the District and its environs, tend to acquire similar local interests to those of local residents, on many issues, gives them more actual influence in Congress than citizens of states.

And, most importantly, despite incorrect statements in the panel opinion, there is no showing that they have been discriminated against here. Each interstate D. C. highway project as it progressed from planning to construction was subjected to the same procedures under Title 23 as interstate state highway projects. The same law applied to all such projects, that being the law that existed at the time the D. C. or state project passed through each successive stage. There is no showing that amendments to the Federal highway laws were made to apply *ex post facto* to highway projects that had previously passed through particular stages *before* new provisions were added. The reason for this is that legislation generally is given a prospective application.

In passing it should be noted that the numerous Fourteenth Amendment cases on equal protection are well recognized as not applying to the situation here. Also, that "unjustifiable discrimination" under those rare Fifth Amendment cases does not exist here because (a) there has not been any refusal to accord D. C. residents any right afforded state residents at the same time, and (b) even if there had been it is not the grievous loss that is "so unjustifiable as to be violative of due process." Schneider v. Rusk, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964); Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); Joint Anti-Fascist Refugee Committee v. McGrath, 341 U.S. 123, 168, 71 S.Ct. 624, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring); *and see* Shapiro v. Thompson, 394 U.S. 618, 641–642, 89

---

18. The statutory definition of "construction" in title 23 is not strictly applicable because section 23 is not a part of Title 23.

S.Ct. 132, 22 L.Ed.2d 600 (1969). Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) applied a similar standard to rights claimed under the Fourteenth Amendment. (See *id.* at 263, 90 S.Ct. at 1018)

I would accordingly not require location or design hearings now on the unfinished portions of the Center Leg that is under construction, nor to the Three Sisters Bridge where location and design had previously been approved. It seems that the Potomac River Freeway and the East Leg have some design problems. Where they stand on location has not been presented or studied in this case. It appears that the 18 months projects are similarly in different categories as to title 23 requirements. Each project should be considered separately, but I do not consider that the 1968 amendments to title 23 or the 1969 PPM require any project to be backed up for different consideration of planning or construction phases that it had previously passed through. I would affirm.